PORTLAND CEMENT ASSOCIATION,
an Illinois not-for-profit
Corporation, Petitioner,

v.

Russell E. TRAIN, Administrator,
Environmental Protection
Agency, Respondent,

Medusa Portland Cement Company and
Northwestern States Portland Cement
Company, Intervenors.

No. 72–1073.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 1, 1975.

Decided May 22, 1975.

Rehearing and Rehearing En Banc
Denied June 19, 1975.

Robert E. Haythorne, Chicago, Ill., with whom Edward W. Warren, Scranton, Pa., was on the brief, for petitioner.

William L. Want, Atty., Dept. of Justice, with whom Wallace H. Johnson, Asst. Atty. Gen., Edmund B. Clark and Martin Green, Attys., Dept. of Justice, were on the brief, for respondent.

Before FAHY, Senior Circuit Judge, and LEVENTHAL * and ROBB, Circuit Judges.

### PER CURIAM:

The court remanded to the Administrator of the Environmental Protection Agency, respondent, the case then before us involving the validity of the stationary source standards[1] he had promulgated[2] under section 111 of the Clean Air Act[3] for new or modified portland cement plants. Portland Cement Association v. Ruckelshaus, 158 U.S.App.D.C. 308, 486 F.2d 375 (1973), cert. denied, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974). Some of the matters the court then reviewed on the petition of the Portland Cement Association we concluded required further consideration and clarification, hence the remand. These matters have now been reconsidered and clarified in the Administrator's Response to the Remand Order, formulated after his draft of such Response had been the subject of comments by the Association and others. The Association has again petitioned this court, to decide whether the Administrator has complied with the remand order and whether the standards should be affirmed or set aside.

At argument petitioner's counsel relied upon a formulation of positions which he handed to the court and which reads as follows:

1. Do established constitutional guarantees against statutory discrimination apply to environmental regulations?

2. If so, may the victim of a discriminatory regulation have it set aside through direct judicial review?

3. Under what, if any, circumstances could economic considerations produce a standard lower than the highest technologically achievable?

4. How does a standard prohibiting *momentary* excessive emissions conform to a statute whose purpose is curbing the total volume of pollution?

5. How can plume opacity be [a] valid standard when pollution and plume opacity can not be reliably correlated and evaluations of the same plume by several qualified observers will vary substantially?

The issues raised in these questions are more limited than those presented by petitioner in its brief. Therefore, although the questions will form the frame of reference for this opinion, other issues will be touched upon as well.

Questions 1 and 2 are directed to petitioner's contention that the emission standard for cement plants is more stringent than those for incinerators and coal-fired power plants, and, also, for plants of the competing asphalt industry, as to which, however, no question had been raised at the agency level.

---

* Circuit Judge Leventhal did not participate in this decision.

1. These standards prescribed a maximum emission limit of .03 gr/scf for particulates (cement dust) from newly-constructed or modified cement plants and a limit of 10% for the opacity of plumes from the stacks of such plants.

2. 40 C.F.R. § 60.62 (December 16, 1971).

3. 42 U.S.C. § 1857c–6.

■ Petitioner's contention is weakened by its admission, made in its comments on the Administrator's draft response to the remand, that the standard for the portland cement industry is achievable by that industry. Moreover, our remanding opinion indicated our disagreement with petitioner on the subject of different emission standards for different industries. See, 486 F.2d at 389. Amplifying upon what we there said, we find no reasonable basis for invalidating as discriminatory the achievable emission standard for cement plants. Proof of unreasonableness in the diversity of the standards referred to is lacking. No doubt the Administrator will be influenced by accumulating experience should it give rise to reasons for modification of the range now existing between the prescribed standards.

■ Petitioner's question No. 3 is very generally phrased. Neither the terms of our remand nor the proceedings now before us require an answer by the court. We note, however, that of course section 111 of the Act requires the Administrator to take into account the cost of achieving the emission reduction he prescribes. In our remanding opinion we did not require respondent to prepare a quantified cost-benefit analysis, showing the benefit to ambient air conditions as measured against the cost of the pollution control devices. We stated, however, that such studies as might be adduced in comments should be considered and that the Administrator should also consider contentions and presentations that the adopted standard unduly precludes the supply of cement, including whether it is unduly preclusive as to certain qualities, areas, or low-cost supplies. Though the Administrator found that "relating the cost of control to the benefits of the control at least at this time is a practical impossibility," he went on to state that where the costs of meeting standards would be greater than the industry could bear and survive, such standards could not be implemented by the industry regardless of technological feasibility, and, moreover, that a gross disproportion between achievable reduction in emission and cost of the control technique would not be required. Here too we find no reason to disagree with the Administrator's disposition of this aspect of the remand. The industry has not shown inability to adjust itself in a healthy economic fashion to the end sought by the Act as represented by the standards prescribed.[4]

Question No. 4 was not at issue on the remand and we accordingly do not feel called upon to deal with it.[5]

■ As to question No. 5, we have considered the detailed analysis by the Administrator of numerous factors involved in the use of plume opacity to determine whether or not a portland cement plant achieves a prescribed standard of pollution control. We are not warranted on the basis of his analysis to find that plume opacity is too unreliable to be used either as a measure of pollution or as an aid in controlling emissions.

The Administrator, using trained plume observers, has enlarged upon the tests previously utilized, in the effort to reach a reasonably accurate standard of measurement of opacity. He sets forth in detail the results which led to his 10% standard "as the standard which may not be exceeded by new kilns at Portland cement plants," with a relaxation, however, now permitted, to 20% opacity "to accomodate certain extreme circumstances." His conclusions in resolving the opacity problem and the achievability of the prescribed opacity standard are well reasoned. The court finds no sound basis for rejecting them, remembering the tempered review we exercise in these matters of non-judicial expertise, and remembering too that in this, as in a

4. The Administrator in his Response to the Remand Order has fully considered and rationally rejected the cost-benefit analysis which was submitted by petitioner.

5. We add that the record before us affords no basis for holding that controlling momentary excessive emissions does not aid in curbing total pollution.

somewhat related area which recently confronted the Supreme Court under the Clean Air Act, the courts cannot and do not "attempt to foresee, at this stage in the administration of the statute, all of the questions, say nothing of the answers, that may arise"—in that case over the allocation of a limited number of available variances under section 110(a)(3) of the Act [6]—in this case over the learning with respect to the value of plume opacity in measuring and controlling pollution.

 We turn to another matter. In our remand decision we held that respondent was not required to file an impact statement pursuant to the National Environmental Policy Act,[7] but should set out "significant adverse environmental consequences" of its standards as a "functional equivalent" of an impact statement. We note now a contention raised by petitioner in this regard, namely, that water pollution will be aggravated as a result of the larger piles of kiln dust caused by the tight emission controls. We have no factual basis, however, for disagreeing with the position of the Administrator that petitioner's contention that the dispersal of the pollutants into the air would better serve the environment. The Administrator satisfactorily responds to this suggested alternative as follows, insofar as the record before us affords a basis for decision:

. . . the total amount of particulates disposed of will be less if collected by emission control devices than if vented uncontrolled into the atmosphere.

\* \* \* \* \* \*

To the extent there is a problem, it is the judgment of the Administrator that the problem of water run off from collected piles of particulate matter is less than the problem of uncontrolled releases of particulate matter into the atmosphere.

 Finally, we note the Administrator's response to the court's direction that the bases for the emission standard should be further identified. At the time of our remand tests on only two cement plants had been conducted. Since then the Administrator has tested five more plants. Although petitioner had an opportunity to comment on the results of only two of these, all seven tests have shown that the emission standard is achievable. The Administrator has in this as in other respects adequately responded to our remand.

 The consequence is that we hold the standards prescribed to be valid. The action of the Administrator in promulgating them is, accordingly,

Affirmed.

---

6. Train, Administrator v. Natural Resources Defense Council Inc, —— U.S. ——, —— n.28, 95 S.Ct. 1470, 1488, 43 L.Ed.2d 731 (1975).

