580 F.2d 623
 188 U.S.App.D.C. 360
 * ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY,
et al., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Commonwealth of Pennsylvania, Alabama Power Co., etc. (the
Southern Co.), the National Cotton Council, Commonwealth
Edison Co. et al., Consumers Power Co., National Steel
Corp., Board of Trade of the City of Chicago et al.,
National Industrial Traffic League, American Electric Power
Service Corp., Copper Development Assn., Inc., Central
Louisiana Electric Co. et al., Farm and Industrial Equipment
Institute, Aluminum Assn., Inc., Intervenors.
COMMONWEALTH EDISON COMPANY et al., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and the United States of
America, Respondents,
Commonwealth of Pennsylvania, National Cotton Council,
American Electric Power Service Corp., Railroads, Atchison,
Topeka, et al., Farm and Industrial Equipment Institute, the
National Industrial Traffic League, Intervenors.
 Nos. 76-2048, 76-2070.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 18, 1978.
Decided May 2, 1978.
 
 Michael Boudin, Washington, D. C., with whom Harry J. Breithaupt, Jr., Washington, D. C., was on the brief, for petitioners in No. 76-2048 and intervenors Railroads, Atchison, Topeka, et al. in No. 76-2070.
 Charles J. McCarthy, Washington, D. C., for petitioners in No. 76-2070 and intervenors, National Cotton Council, et al. in Nos. 76-2048 and 76-2070.
 David I. Wilson, Washington, D. C., with whom Owen M. Johnson, Jr., Washington, D. C., was on the brief, for amicus curiae, Federal Trade Commission urging reversal of order of Ex Parte No. 320 and remanding record in No. 76-2048.
 Robert Thompson, Atty., Dept. of Justice, Washington, D. C., with whom Barry Grossman, Lloyd John Osborn, Joseph J. Saunders and Mark M. Levin, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondent United States of America in Nos. 76-2048 and 76-2070.
 Henri F. Rush, Atty., I.C.C., Washington, D. C., with whom Mark L. Evans, Gen. Counsel and Charles H. White, Jr., Associate Gen. Counsel, Washington, D. C., were on the brief, for respondent, Interstate Commerce Commission in Nos. 76-2048 and 76-2070.
 Gordon P. MacDougall, Washington, D. C., was on the brief for intervenor, Commonwealth of Pennsylvania in Nos. 76-2048 and 76-2070.
 John F. Donelan, Frederic L. Wood, John K. Maser, III and Renee D. Rysdahl, Washington, D. C., were on the brief, for intervenor, The National Industrial Traffic League in Nos. 76-2048 and 76-2070.
 J. Raymond, Clark, Washington, D. C., with whom W. Randall Tye, Augusta, Ga., John P. Tucker, Jr., Atlanta, Ga., Charles J. McCarthy and John Guandalo, Washington, D. C., were on the brief, for intervenor, Alabama Power Co., et al. in No. 76-2048.
 Harold E. Spencer, Chicago, Ill., and John M. Cutler, Jr., Washington, D. C., were on the brief, for intervenors, Board of Trade of the City of Chicago, et al. in No. 76-2048.
 Dickson R. Loos and Barry Roberts, Washington, D. C., were on the brief, for intervenors, Aluminum Association, Inc. in No. 76-2048.
 Daniel J. Sweeney, Chicago, Ill., entered an appearance for intervenor, Farm and Industrial Equipment Institute in No. 76-2048.
 Edmund E. Harvey, Washington, D. C., entered an appearance for intervenor, Copper Development Assn., Inc., in No. 76-2048.
 Charles W. Chapman, Washington, D. C., entered an appearance for intervenor, National Steel Corp. in No. 76-2048.
 Before LEVENTHAL, MacKINNON and ROBB, Circuit Judges.
 Opinion for the Court filed by LEVENTHAL, Circuit Judge.
 LEVENTHAL, Circuit Judge:
 
 
 1
 This case involves the efforts of the Interstate Commerce Commission to implement the Railroad Revitalization and Regulatory Reform Act of 1976, 90 Stat. 31. That statute is hereafter referred to as the Reform Act, or the Act. The provisions critical in this case are in § 202, part of which is set forth in Appendix A. They deprive the ICC of jurisdiction to regulate railroad rates except where a railroad possesses "market dominance,"[1] and require the Commission to establish standards and procedures for determining whether a railroad possesses market dominance over a service that it renders or proposes to render at a particular rate.[2]
 
 
 2
 The Act was passed February 5, 1976. On October 1, 1976 the Commission issued an order promulgating procedures for making findings of market dominance. At the core of these procedures are four rebuttable presumptions, which are triggered by a variety of fact situations. Three of these are presumptions of market dominance; the fourth is a presumption of lack of effective competition from certain carriers.
 
 
 3
 In No. 76-2048, petitioner railroads argue that the presumptions of market dominance are invalid because they nullify Congress's attempts at reform. In No. 76-2070, petitioner electric companies urge that the presumption of lack of effective competition from certain carriers is inadequate, and should be replaced by a presumption of market dominance.
 
 I. BACKGROUND
 
 4
 Prior to the 1976 enactment of the Reform Act, all rail rates for interstate service were subject to regulation by the Commission under the "just and reasonable" standard.[3] In enacting the Reform Act, Congress instituted a major change in the regulatory framework governing rail rates, by mandating the deregulation of rates that are not a product of market dominance.
 
 
 5
 The legislation was prompted by congressional awareness of the financial difficulties encountered, in recent years, by many railroads throughout the nation.[4] Through the Act, and particularly by means of its deregulatory features, Congress sought to restore the financial stability of our railway system and promote its revitalization.[5] While the Act embodies a policy of permitting railroads greater freedom to raise or lower rates in competitive markets, and of increasing the attractiveness of investing in railroads, it also enunciates Congress's concern that the needs of the railroads for economic revitalization be balanced against the interests of shippers and the public.[6]
 
 
 6
 The statutory scheme reflects such a balanced approach by establishing a two-stage process for the exercise of regulatory authority by the Commission. Before the Commission may find that a rate challenged as excessive is unjust or unreasonable (or that it has not been shown to be just and reasonable), it must first find that the proponent carrier has market dominance over the service to which the rate applies. Having found market dominance, the Commission applies its "just and reasonable" standard to the challenged rate, as it did before the Reform Act. Where market dominance is not found, the Commission is deprived of jurisdiction to scrutinize the rate.[7]
 
 
 7
 Section 202(a) defines "market dominance" as "an absence of effective competition from other carriers or modes of transportation, for the traffic or movement to which a rate applies. . . ." As noted, § 202(b) directs the ICC to establish standards and procedures for determining whether a railroad possesses market dominance for the particular service to which the rate applies. These standards and procedures must be "designed to provide for a practical determination without administrative delay."
 
 
 8
 Pursuant to this directive, the Commission issued a notice of proposed rulemaking on March 10, 1976. In addition to setting forth proposed rules regarding the production of evidence in the various types of proceedings in which a proposed rate may be challenged as excessive, the notice set out a series of seven fact situations that would trigger a rebuttable presumption of market dominance,[8] together with a brief explanation of the basis for each. Comments were submitted by a number of interested persons, including railroads, utilities, the Justice Department, the Federal Trade Commission, and the Department of Transportation. J.A. 9-723. On August 20, 1976, after consideration of these comments, the Commission issued an interim report, in which it reduced to four the number of fact patterns that would trigger presumptions facilitating market dominance determinations.[9] Additional comments were submitted and considered by the Commission.
 
 
 9
 On October 1, 1976, the Commission issued the final order that is now before us, in which it promulgated, with some adjustments,[10] the four presumptions that it had proposed in its interim report.[11] Under the final order, the following fact situations will give rise to a rebuttable presumption that the carrier whose rate is in issue has market dominance over the involved traffic or movement:
 
 
 10
 (1) Where the proponent carrier has handled 70 percent or more of the involved traffic or movement during the preceding year; the market share of the proponent will be deemed to include the share of any affiliates, and of any carrier participating in the rate or with whom the proponent carrier has discussed, considered, or approved the rate in issue;
 
 
 11
 (2) Where the rate in issue exceeds the variable cost of providing the service by 60 percent or more; and,
 
 
 12
 (3) Where affected shippers or consignees have made a substantial investment in rail-related equipment or facilities which prevents or makes impractical the use of another carrier or mode.
 
 
 13
 Final order of Oct. 1, 1976, Appendix A at 3-4, J.A. 1206-07. In addition, where a rate in issue has been
 
 
 14
 (4) discussed, considered or approved under a rate bureau agreement filed with the Commission pursuant to section 5a or 5b of the Interstate Commerce Act, a rebuttable presumption will arise that a carrier participating in the rate or in such discussion or consideration does not provide effective competition to the proponent rail carrier for the involved traffic or movement.
 
 
 15
 Id. at 3, J.A. 1206.II. LEGALITY OF THE CHALLENGED REGULATIONS
 
 A. Standard of Review
 
 16
 In determining whether the presumptions established by the ICC are valid, we apply, as our standard of review, whether a rational connection exists between the facts giving rise to a presumption and the fact presumed. That approach has been accepted by the parties. See Brief for the railroads (petitioners in No. 76-2048) at 43; Brief for the Interstate Commerce Commission at 28. The "rational connection" principle was first enunciated in Mobile, J.&K.C.R.R. v. Turnipseed, 219 U.S. 35, 43, 31 S.Ct. 136, 55 L.Ed. 78 (1910), where the Supreme Court upheld a statutory presumption against challenge on due process and equal protection grounds. Commentators have subsequently suggested that there may be valid reasons in the law of evidence for presumptions that are not based on probability or rational connection.[12]
 
 
 17
 We do not deal, however, with a constitutional challenge or a statutory presumption. The Commission is not free, as the legislature may be, to formulate a presumption that derives rationality from policy considerations of its own choosing, and that is subject to attack only on constitutional grounds. We must ascertain whether presumptions embodied in the challenged regulations represent a legitimate exercise of the Commission's authority under the Reform Act, or whether, by contrast, they reflect arbitrary agency action. The Rule of Administrative Law requires that the challenged presumptions bear a rational relationship to the market dominance criterion of the Act. For present purposes this is essentially equivalent to the rational connection test of the Turnipseed doctrine.
 
 
 18
 Our judicial function must combine restraint with scrutiny. Although this agency's presumption regulations do not have the same protection as a statutory presumption, they are entitled to deference, even on the issues of law involved in statutory interpretation. And that deference is heightened where, as here, the regulations at issue represent the Commission's initial attempt at interpreting and implementing a new regulatory concept. The governing doctrine was restated in Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), where the Supreme Court stated:
 
 
 19
 When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. "To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." (Citations.) "Particularly is this respect due when the administrative practice at stake involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new." Power Reactor Co. v. Electricians, 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924.
 
 
 20
 Id. at 16, 85 S.Ct. at 801. See also Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 210, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972); Chemehuevi Tribe of Indians v. Federal Power Commission, 420 U.S. 395, 409-10, 95 S.Ct. 1066, 43 L.Ed.2d 279 (1975).
 
 
 21
 It is important to keep in mind that the regulations are part of an ongoing process of agency scrutiny, correction and refinement. The Commission has stated as much:
 
 
 22
 As experience is gained in the implementation of the concept of market dominance, refinements and modifications may be required. Accordingly, this proceeding will remain open so that parties and other concerned persons may petition for any changes they believe are necessary. The continuing nature of this proceeding will permit re-evaluation of the various standards and procedures, based upon actual experience. The Commission will continue its effort to achieve the sensitive balance between the need for rail carriers to be relieved from rate regulation in competitive markets and the need of the public to be protected from unwarranted rate increases where competition will not insure such protection, in accordance with the intent of Congress.
 
 
 23
 Final order of Oct. 1, 1976, at 13, J.A. 1200.
 
 
 24
 In addition the legislative committees have expressed their intention to exercise the function of overseeing the Commission's administration of the market dominance test.[13]
 
 
 25
 In sum, the challenged regulations are a "first cut" by the Commission in putting into operation a new regulatory scheme, and as such are entitled to an extra dollop of judicial deference.
 
 B. The Presumptions
 
 26
 1. General legality of presumptions as a regulatory tool
 
 
 27
 In examining the propriety of presumptions as a regulatory technique, we begin by repeating the mandate of § 202(b) of the Reform Act, that the standards and procedures established by the Commission for implementing the market dominance criterion be "designed to provide for a practical determination without administrative delay." The Commission has chosen to comply with this mandate through the use of presumptions.
 
 
 28
 The Federal Trade Commission urges that the use of presumptions to find market dominance is inappropriate, since they oversimplify a complex area. Brief of the Federal Trade Commission at 9.
 
 
 29
 The FTC appears in this court as amicus curiae, but its voice is amplified by its general identification with "market dominance" problems in its own law, and the statutory instruction of the Reform Act that the ICC consult with the FTC in the course of establishing rules for the determination of market dominance. See § 202(b) of the Act.
 
 
 30
 The FTC stresses that the ICC's adoption of the challenged presumptions fails to take into account a number of considerations of unquestionable relevance to the issue of market dominance number and size of other firms in the market; height of entry barriers; number and size distribution of buyers; history of the conduct of firms operating in the market, etc. The ICC report takes account of this problem with assurances that "the presumptions are not the exclusive means of proving market dominance. If a preponderance of any other relevant evidence indicates that effective competition for the traffic or movement to which the rate applies does not exist, a finding of market dominance will be made. All relevant evidence presented by both sides will be given full consideration." I.C.C. Final Order at 13, J.A. 1200. The FTC is not mollified. If such full consideration is the intention of the Commission, argues the FTC, then there is little need for "shortcuts." FTC Brief at 15.
 
 
 31
 The FTC's position ignores the potential contribution that presumptions may make toward the goal of efficiency and manageability in the kind of market dominance determinations projected under the Rail Reform Act. The burden of coming forward with evidence may discourage the proponent of a rate increase from litigating the issue of market dominance before interested parties, and the Commission, have invested a great deal of time and effort in formally introducing into evidence relevant factual data and expert testimony, and disputing their significance. This result seems especially likely in view of the superior vantage point that the carrier will normally have for preliminarily assessing these factors.
 
 
 32
 If, on the other hand, the challenged presumptions fail to identify, with a fair degree of validity, true market dominance situations (as the FTC predicts), then those carriers who are presumptively, but falsely, classified as market dominant will probably pursue the issue and introduce evidence of all relevant factors in market dominance hearings. If events develop in this way, the Commission will have reason to reassess the adequacy of its particular presumptions and even, perhaps, to question the general wisdom of employing presumptions as a regulatory technique. At this early stage in the implementation of the Reform Act, we cannot conclude nor has the FTC adduced evidence that would demonstrate that presumptions cannot, in practice, identify market dominance with fair accuracy in a substantial number of cases, thus promoting efficiency in accordance with the legislative mandate.[14]
 
 
 33
 2. The market share presumption.
 
 
 34
 All parties recognize the relevance of market share to market dominance, and all acknowledge the reasonableness of the 70% Market share figure that the Commission has declared will give rise to a presumption of market dominance.[15]
 
 
 35
 The objection presented to us is leveled at the Commission's failure to adopt a counterpresumption of Absence of market dominance when the proponent carrier controls a smaller share of the market, and the Commission's decision to exclude from the definition of the relevant market certain types of competition. These objections are presented by the railroads, joined by the Justice Department. The Federal Trade Commission takes a different view.[16]
 
 
 36
 Lack of counterpresumption of absence of market dominance
 
 
 37
 Section 202(b) of the Reform Act requires the Commission to establish "standards and procedures for determining . . . whether and when a carrier possesses market dominance . . . ." This language suggests a legislative focus on procedures for determining the presence of market dominance rather than its absence.[17] This is the approach that the Commission has adopted, ICC Brief at 49-50, and we cannot say it is arbitrary or flies in the face of the Act. The Commission may be confident of the existence of market dominance when the proponent carrier's market share exceeds 70%, and yet not confident of the existence of effective competition when the market share is less than 70% Or indeed less than any particular figure. There is nothing inherently illogical or unfair in this position, as the railroads seem to argue.[18]
 
 
 38
 The Commission adopted its position after a review of relevant antitrust precedents under sections 1 and 2 of the Sherman Act, and section 7 of the Clayton Act. Interim Report of the Commission at 36-43, J.A. 760-67. It noted that courts have generally found monopolization where market shares exceed 70% And have found a lessening of competition where market shares exceed 25%. It further observed that courts have been reluctant to set a lower limit of market share beneath which monopolization would not be found, preferring to consider cases involving low market shares on their particular facts. Id. at 39, J.A. 763. These observations preclude any judicial determination that the Commission acted arbitrarily in declining to adopt a counterpresumption of effective competition.
 
 
 39
 We further observe that a counterpresumption based on a modest market share would have the effect of undercutting the other presumptions to be discussed. Assuming at this point the validity of the cost and investment presumptions, a railroad subject to either or even both of these would be enabled to argue that they had been diluted by the market share counterpresumption. A different argument might have been made for a counterpresumption arising from the lack of any of the presumptions. Such a counterpresumption is not articulated. There would still be a logical argument against such a counterpresumption, but we will not pursue the point, partly because it has not been pressed in those terms, and partly because it may well turn out in practice that there will be few, if any, instances in which the ICC will seek to find market dominance in the absence of any of its presumptions. Taking a pragmatic approach to the problem, rather than one rooted primarily in abstract logic, this court leaves it to the future to see what shape if any will materialize.[19]Relevant market
 
 
 40
 The question of the relevant market remains to be examined. The Commission has indicated that, in determining the size of the relevant market for purposes of applying the market share test, it will not take into account private competition,[20] potential competition,[21] geographic competition,[22] or product competition.[23] The Commission will permit evidence of private and potential competition to rebut a presumption of market dominance, but will not consider geographic or product competition, even on rebuttal. See Final Order at 9-11, J.A. 1196-98; Interim Report at 53-58, 59-60, 61, J.A. 777-82, 783-84, 785; ICC Brief at 56 n. 29, 62-64.
 
 
 41
 The railroads argue that these four types of competition should be considered in determining the size of the relevant market when applying the market share presumption. The Justice Department sees the reasonableness of deferring consideration of private and potential competition to rebuttal but believes that the Commission was arbitrary in not permitting, on rebuttal, evidence of geographic and product competition as well.
 
 
 42
 What comes into play at this juncture is the statutory mandate of manageability including the direction in § 202(b) that the ICC's standards and procedures be "designed to provide for a practical determination without administrative delay." When these aspects of the market share test are evaluated in light of the statutory mandate of manageability, we believe they fall well within the reasonable discretion of the Commission in implementing the Act. As the Justice Department acknowledges, Brief at 16, it would be highly impractical for the Commission to consider potential competition in applying the market share test, since a potential competitor by definition controls no share of the market. Consequently, what would be required are estimates of potential competition, giving rise to the need for highly complex and no doubt conflicting evidence, before the initial determination could be made as to whether the presumption was triggered. Such a prospect provides ample justification for the Commission's decision to limit this evidence to rebuttal, in its effort to provide for "practical determination without administrative delay."
 
 
 43
 Similarly, the Commission understandably sought to avoid entanglement in preliminary complexities when it limited evidence of private competition to rebuttal. While data concerning private competition are more available, and involve less speculation than is the case for potential competition, the significance to be assigned to the data is not easy to discern. It would be fallacious to assume that private carriage has the same competitive impact as carriage for hire. As the Commission points out, the private carriage of one company is not in competition for the traffic of another. Interim Report at 61, J.A. 785. There are also problems of inefficiency in some private carriage projections (due to inability to arrange backhauls) that may make it a highly ineffective source of competition. Id. Certainly there are, as the Commission acknowledges, situations where private competition has a significant impact on the issue of market dominance. But determining the magnitude of this impact in a particular case will require examination of such complex issues as the size and resources of the shippers, and the efficiency of their private carriage operations as compared with those of a commercial carrier. It would unduly complicate the application of the market share presumption to require the Commission to undertake such studies before it could determine whether that preliminary presumption was triggered.
 
 
 44
 The need to assess geographic or product competition as a preliminary step in the application of the market share presumption would present a similar danger of embroiling the Commission in highly complex evidentiary proceedings before it could determine whether the presumption would apply. It was thus reasonable for the Commission to exclude consideration of these forms of competition in the first instance. It is another matter whether these issues may be excluded altogether.
 
 
 45
 The Act defines "market dominance" as the "absence of effective competition from other carriers or modes of transportation, for the traffic or movement to which a rate applies . . . ." Section 202(b) of the Act, 49 U.S.C. § 1(5)(c) (i). As a matter of strict logic, the phrase "for the traffic or movement to which a rate applies" would seem to exclude from consideration competition that manifests itself in the form of "traffic" or "movement" Other than that to which the rate in question applies. Shipment of a product to another geographical location, or shipment of a different product, would certainly appear to involve "traffic" or "movement" other than that to which the rate applies. This is essentially the statutory argument advanced by the Commission. Interim Report at 54, J.A. 778. The construction may appear to some as an attempt to attribute excessive significance to a terse statutory clause. But we cannot say that it is an unreasonable reading, particularly in light of the clear emphasis placed by the Act upon efficiency and practicality. The latter mandate applies, of course, to the entire procedure designed by the Commission for the determination of market dominance not merely to the initial determination of whether a presumption is triggered. The Commission's reading of the statutory definition of market dominance insures that the highly complex issues of geographic and product competition will not create delay in the determination of market dominance, even in the rebuttal stage of the proceeding. We believe there is sufficient basis in the statutory language and purpose to merit our deferral to the Commission's view.
 
 3. The cost presumption
 
 46
 The Commission's rationale in support of the cost presumption was set forth in its Interim Report: "Lack of effective competition and the resulting low elasticity of demand for rail transport usually permit relatively high rates and the cost presumption is grounded upon this causal relationship." Interim Report at 66, J.A. 790.
 
 
 47
 In principle, we cannot say that it is arbitrary for the ICC to say that some rates may be so excessive as in themselves to imply, at least presumptively, a position of market dominance.[24] The difficulty lies in the application of the principle. What particularly concerns us is whether the Commission has adequately articulated its reasons for settling upon the figure of 160% Of variable costs to trigger the presumption. Such articulation is a necessary predicate for conscientious judicial review. See Kennecott Copper Corp. v. EPA, 149 U.S.App.D.C. 231, 234-35, 462 F.2d 846, 849-50 (1972). The railroads, the Justice Department, and the Federal Trade Commission are uniformly of the view that the Commission has not met this requirement.
 
 
 48
 In its initial Notice of Proposed Rulemaking and Order of March 10, 1976, the Commission proposed that a presumption of market dominance should be triggered where the rate at issue exceeds the fully allocated cost of providing the service by 50 percent or more. Id. at 5, J.A. 6. In its Interim Report, it substituted for this a figure of 80 percent in excess of variable cost. Interim Report at 63, J.A. 787.[25]
 
 
 49
 The Commission explained the basis for the 80% Figure in this language:
 
 
 50
 (F)ully allocated costs approximate 129 percent of variable costs. The presumption, which does not come into play until a rate reaches a level of 180 percent of variable cost, focuses only on rates which are well above that revenue level which is sufficient to cover all expenses, rents, and taxes, excluding Federal Income taxes.
 
 
 51
 Id. In essence, then, the Commission appeared to permit a leeway of 51 percent of variable costs (180%-129%) to cover a reasonable profit (by implication) and federal income taxes payable by reason of earning that profit. (Expenses, rents, and taxes other than federal income taxes, were, of course, included in the base figure of 129% Of variable costs.) It did not, however, explain how it arrived at this degree of leeway, beyond alluding to a recent rail revenue contribution study showing that the great preponderance of commodity classes return revenues which are less than 180 percent of variable cost. Id. at 71, J.A. 795. More particularly, it did not state what it considered a fair profit, and why.[26]
 
 
 52
 In its Final Order, the Commission revised this figure downward, promulgating a presumption of market dominance when the rate in issue exceeds the variable cost of providing the service by 60 percent or more. Final Order, Appendix A, at 3-4, J.A. 1206-07, and see Final Order at 14, J.A. 1201, for separate opinion of Commissioner Corber concurring in the 60% Figure. By way of explanation, the Commission stated:
 
 
 53
 Upon consideration of the comments of the parties, we are persuaded that a rebuttable presumption of market dominance where a rate exceeds 160 percent of variable cost will more accurately reflect the absence of effective competition. Available evidence indicates that railroad fully allocated cost approximates 129 percent of variable cost. If an allowance is made for Federal income taxes and a reasonable profit level, a ratio of fully allocated costs to variable costs between 140 percent and 150 percent (including margin for error) would appear to be the highest level at which a rail carrier could be said to possess only minimal market power. Where a rate exceeds 160 percent of variable cost, a rail carrier actually moving traffic thereunder will usually have substantial market power.
 
 
 54
 Final Order at 2, J.A. 1189. No reason was provided for the reduction in the leeway allowed for federal income taxes and profit, and, again, the Commission failed to indicate what it had in mind as a reasonable profit.
 
 
 55
 In its order of February 22, 1977, denying the petition for reconsideration filed by the Council on Wage and Price Stability, the Commission reiterated, for the most part, the rationale set forth in its Final Order. Order of Feb. 22, 1977, at 2, J.A. 1269. An arguably additional source of enlightenment was offered, however, on the question of reasonable profit:
 
 
 56
 (A) rate which exceeds 160 percent of variable cost generally will not only cover fully allocated cost, but will also cover non-cost expense items (such as Federal income tax), as well as a reasonable rate of return (as determined by the Coordinator in Ex Parte 271, Net Investment Railroad Rate Base and Rate of Return, 345 I.C.C. 1494, 1605 (1976)) and . . . will additionally provide a premium not related to or caused by the above factors. . . .
 
 
 57
 Id. The citation to Ex Parte No. 271 is apparently intended to refer to a determination, in that proceeding, that "a 6- to 10-percent overall target rate of return would not be unreasonable under present conditions." 345 I.C.C. at 1605.
 
 
 58
 We fear we are unable, after tracing the sequence of determinations summarized above, to comprehend with sufficient clarity the reasoning by which the Commission arrived at its final figure of 160% Of variable costs. We see some indication albeit tardily manifested that the Commission contemplated a 6- to 10-percent rate of return on net investment to be reasonable.
 
 
 59
 In the last analysis, we cannot regard the inclusion of a somewhat cryptic parenthetical citation, in an order denying reconsideration, to operate as a satisfactory explication of a key issue bearing on the validity of this presumption: whether it permits an adequate rate of profit. The cost presumption will have "bite" only where the other presumptions are not triggered. The Commission is apparently prepared to say that even though a proponent carrier has less than 70% Of the market, a rate exceeding variable cost by 60% Establishes a presumption of market dominance.[27] Such a conclusion, even though rebuttable, must be based, we believe, on a clearer explication of the Commission's views on appropriate profit levels, and its reasons therefor. We in no way intimate that we think the Commission erred in its approach or result. We only say that we do not sufficiently comprehend its reasoning.
 
 4. The investment presumption
 
 60
 A presumption of market dominance is created "where affected shippers or consignees have made a substantial investment in rail-related equipment or facilities which prevents or makes impractical the use of another carrier or mode." Final Order, Appendix A, at 3-4, J.A. 1206-07. The Commission set forth the basis for this presumption in its Interim Report:
 
 
 61
 If a market is to be truly competitive, shippers must be able to respond quickly to changes in transportation charges. They must be in a position to shift their demand from one rail carrier to other rail carriers or carriers of other modes. Such a shift in demand requires not only the availability of carriers ready to provide a comparable service, but also the ability of the shippers to take advantage of that service. Shippers must be able to make the choice to use an alternative service without absorbing substantial economic loss. The greater the cost of making a shift in carriers, the greater the chance that the carrier will be in a position to extract substantial premiums without fear of diverting traffic to other carriers.
 
 
 62
 A shipper's investment in rail-related facilities ordinarily reflects a business judgment that rail transportation will be the most economical for its purposes, at least in the near future. In making this decision the shipper must consider its total transportation costs. The total rail transportation cost is the rail rate plus the expense of the rail related equipment which could theoretically be allocated to a particular movement. If the movement is in shipper owned or leased cars, the carrier either publishes a special rate for freight moving in shipper owned cars or publishes an allowance. The shipper has made a commitment to paying at least the part of the rail transportation cost represented by the allocated cost of the rail related equipment. It is true that at some point the shipper may attempt to minimize his losses by selling his equipment, but such a change in operations usually cannot be accomplished without a substantial loss to the shipper. If the capital investment represents a substantial portion of the total transportation cost, then the rail carrier may be in a position to increase its rates substantially without fear of diverting a significant amount of traffic to the other mode. Under these conditions, the rail carrier would have market dominance over the service in question.
 
 
 63
 Interim Report at 75-76, J.A. 799-800.
 
 
 64
 The principal objection leveled at the investment presumption is that the facts giving rise to the presumption bear no rational relationship to market dominance i. e., a finding of market dominance may be made despite the availability of alternative transportation services. Thus, the railroads are concerned that the investment presumption would permit a group of shippers to convert a transportation market actually characterized by effective competition into one characterized artificially as rail dominant simply by making a "substantial" investment in rail-related facilities. Brief for Petitioners in No. 76-2048 at 58. Similarly, it is objected that a substantial investment in rail-related facilities by itself does not prevent the use of other transportation services or even create a likelihood that such alternatives will remain unused. Id. at 62.
 
 
 65
 We believe this concern was largely answered by ICC counsel at oral argument, at which time he made clear that the presumption will arise only when the investment in rail-related equipment does In fact make impractical or prevent the use of another carrier or mode.[28] We accept this construction of the presumption regulation. So construed, we uphold it as rational.
 
 
 66
 An additional objection to the investment presumption is asserted on the ground that it cannot be reconciled with section 206 of the Reform Act, which provides a different form of protection to certain shippers investing in rail-related equipment. Section 206, 49 U.S.C. § 15(19), is designed to encourage investments of $1,000,000 or more by carriers, shippers, receivers, or others in rail-related facilities by expediting Commission consideration of a rate schedule proposed in connection with such investment, and by providing that such rate schedule may not, for a period of five years after its effective date, be suspended or set aside as unlawful under sections 1 through 4 of the Interstate Commerce Act. The railroads, supported by the Justice Department and the Federal Trade Commission, argue that Congress, in promulgating section 206, selected the amount and nature of the investment to which it wished to extend protection, and the mechanism for doing so. According to this view, the additional protection afforded by the investment presumption (I. e., for investments under $1,000,000, and for investments already in existence), and the distinct mechanism by which it is afforded were impliedly rejected by Congress when it enacted section 206.
 
 
 67
 We are not persuaded by this argument. Section 206 differs from section 202 in its focus. Section 206 protects large investments in rail-related facilities whether made by the shipper, the railroad, or another person so as to encourage such investments. By contrast, the central purpose of section 202 is to bring about deregulation of rail rates where appropriate, while maintaining controls in market dominant situations. The two sections are undoubtedly related conceptually, in that they both reflect an effort to promote revitalization of our rail system. But they differ sufficiently in their approaches to this goal that the scope of section 206 cannot automatically be superimposed upon section 202 to limit the range of regulations promulgated thereunder.
 
 5. The rate bureau presumption
 
 68
 In its initial Notice of Proposed Rulemaking, issued on March 10, 1976, the Commission proposed that market dominance would be presumed whenever the rate in issue had been discussed or considered before a rail carrier rate bureau. Notice of Proposed Rulemaking at 5, J.A. 6. This proposal was criticized by the railroads and others on the ground that it failed to take account of competition from other modes of transportation. In its Interim Report, the Commission modified this proposal to provide that carriers who have participated in a rate bureau discussion of the rate in issue, or who participate in the rate, would be presumed not to provide effective competition to the proponent carrier. As modified, the proposal left open the possibility that effective competition for a rate discussed in a rate bureau might be provided by rail carriers not participating in the rate or in the rate bureau discussion, or by other modes of carriage. Interim Report at 24-30, J.A. 748-54. The presumption was promulgated in this form. Final Order at 7, Appendix A at 3-4; J.A. 1194, 1206-07.
 
 
 69
 Petitioner electric companies in No. 76-2070 urge that discussion of a rate in a rate bureau should give rise to a presumption of market dominance rather than merely lack of effective competition by rail carrier participants in the rate or discussion. The electric companies believe that the Commission, in cutting back on the extent of this presumption, has created a regulatory "gap" that would place shippers at the mercy of the railroads without protection either from the antitrust laws or ICC regulation, contrary to the intent of Congress.
 
 
 70
 Petitioners derive the "gap" concept from a consideration of the rationale behind the Reed-Bulwinkle Act (section 5a of the Interstate Commerce Act, 49 U.S.C. § 5b). By that provision, enacted in 1948, Congress authorized the Commission to approve agreements among common carriers relating, Inter alia, to rates, and to procedures for their joint consideration by carriers. With respect to such agreements, and the carrying out of their provisions, the Reed-Bulwinkle Act relieved the carriers of the operation of the antitrust laws. 49 U.S.C. § 5b(9). Section 208 of the Reform Act amends section 5a of the Interstate Commerce Act to make it inapplicable to railroads, and enacts a new section 5b, 49 U.S.C. § 5c, applicable only to railroads, which continues the antitrust immunity enjoyed by the railroads under Reed-Bulwinkle. See 49 U.S.C. § 5c(8).[29] Petitioners draw upon the legislative history of Reed-Bulwinkle to emphasize that Congress's willingness to create an antitrust exemption was predicated upon the existence of regulatory controls over the rates in question a proposition that few would dispute.
 
 
 71
 From this, and the related observation that repeals of the antitrust laws by implication from a regulatory statute have been disfavored,[30] petitioners attempt to fashion a rule of utmost rigidity: they would require regulatory control of a rate where market forces affecting that rate have been tainted in any degree whatsoever by operation of a rate bureau agreement. Citing the Conference Report to the effect that the Reform Act was intended to deregulate rates only where they would "be set by the forces of competition," Brief at 13, they go on to argue thatevery price-fixing agreement (i. e., rate bureau agreement) eliminates some part of the competitive picture and prevents prices from being "set by the forces of competition." It follows that two or more railroads which set rates in concert thereby achieve market dominance over the service rendered under such rates.
 
 
 72
 Nothing in the legislative history or language of the Reform Act supports this argument. On the contrary, the Conference Report (cited by petitioners themselves, Brief at 16), points in quite the opposite direction:
 
 
 73
 While the absence of effective competition test is not intended to strictly conform with the standards of the antitrust laws, it is intended that when the Commission administers the test it will recognize the absence of forces which normally govern competitive markets. Inasmuch as the new section 5b permits the consideration of rates free from the antitrust restrictions which would otherwise control competitive markets, the Committee of Conference intends that there will be presumed to be an absence of effective competition Between railroads with respect to any rate discussed or considered under an agreement approved by the Commission pursuant to new section 5b of the Interstate Commerce Act.
 
 
 74
 Conference Report at 148; U.S.Code Cong. & Admin.News 1976, p. 163 (emphasis added). Similarly, the terms of the Act preclude a finding of market dominance where there exists "effective competition from other carriers Or modes of transportation . . . ." Section 202(b), 49 U.S.C. § 1(5)(c)(i). (Emphasis added.) In the face of these quite specific indications that Congress intended the Commission to consider All sources of competition when determining market dominance, the general policy arguments of petitioners have little force.[31]
 
 
 75
 Petitioners, in their efforts to apply, without modification, principles borrowed from related contexts, fail to appreciate the nuances of the scheme of the Reform Act. The statute establishes a new mechanism for reconciling the goal of revitalizing our rail system with the need for continued protection of those who use its services. The rate bureau presumption strikes an appropriate balance between these sometimes conflicting policies, and as such represents a reasonable exercise of the Commission's discretion.[32]
 
 III. CONCLUSION AND DISPOSITION
 
 76
 The challenged regulations represent the initial phase in the Interstate Commerce Commission's implementation of a new regulatory concept. Congress has called upon the Commission to apply its expertise in devising practical techniques for the deregulation of rail rates where their regulation can be trusted to market forces. The Commission's first efforts to give substance to this mandate have elicited a collation of counsel, critique and importunity.
 
 
 77
 The railroads see the Reform Act as directed at blowing away the clutter and cobwebs of outmoded regulation, permitting our rail system to regain initiative and vigor. Under this view, the Commission emerges as clutching on to its musty jurisdiction against the inroads of reform. The utilities complain that the railroads' enthusiasm for competition is marred by the tenacity of their grip on their antitrust exemption, a quest for power without responsibility.
 
 
 78
 The Justice Department and the FTC have special status as consultants under the Act. Each has had experience in coping with the fearsome complexities of the antitrust laws. They identify the ICC's efforts as marred by naivete, unresponsive to the nuances of market behavior.[33]
 
 
 79
 The Commission identifies itself with prudent progress, moving into promising but unexplored territory, but hesitant lest vast areas of the rail carriage market revert to ruthless predators.
 
 
 80
 These broad strokes are not mere allegory. They provide an overview of the controversy that moves from its details to a broad sweep. Overall, the court's role is one of deference and deferral. The Commission will be in a position to evaluate the regulations more fully in the light of experience. That is an important feature of the administrative process. The courts remain open if the Commission is slothful or unwilling to undertake appropriate reconsideration and fine tuning in the light of experience. Permian Basin Area Rate Cases, 390 U.S. 747, 822, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); Public Service Commission of N.Y. v. FPC, 167 U.S.App.D.C. 100, 511 F.2d 338 (1975) (advance payments remand). Meanwhile, the Commission's effort in fulfilling this task deserves approval, for the most part, when judged under the deferential standard to which it is entitled.
 
 
 81
 In one respect, we remand to the Commission to provide the clarification that we believe is necessary in regard to the cost presumption. We do not invalidate the cost presumption. The Commission may conclude that it should be retained. However, on the remand, the Commission will have authority to modify the regulation in the light of further reflection.[34] All other elements of the challenged regulations are upheld as a reasonable exercise of agency discretion under present circumstances.
 
 
 82
 So ordered.
 
 APPENDIX A
 
 83
 Section 202 of the Railroad Revitalization and Regulatory Reform Act of 1976 provides in part:
 
 
 84
 Sec. 202. (a) Section 1(5) of the Interstate Commerce Act (49 U.S.C. 1(5)) is amended by inserting "(a)" immediately after "(5)" and by adding at the end thereof the following new sentence: "The provisions of this subdivision shall not apply to common carriers by railroad subject to this part."
 
 
 85
 (b) Section 1(5) of the Interstate Commerce Act (49 U.S.C. 1(5)), as amended by subsection (a) of this section, is further amended by adding at the end thereof the following new subdivisions:
 
 
 86
 "(b) Each rate for any service rendered or to be rendered in the transportation of persons or property by any common carrier by railroad subject to this part shall be just and reasonable. A rate that is unjust or unreasonable is prohibited and unlawful. No rate which contributes or which would contribute to the going concern value of such a carrier shall be found to be unjust or unreasonable, or not shown to be just and reasonable, on the ground that such rate is below a just or reasonable minimum for the service rendered or to be rendered. A rate which equals or exceeds the variable costs (as determined through formulas prescribed by the Commission) of providing a service shall be presumed, unless such presumption is rebutted by clear and convincing evidence, to contribute to the going concern value of the carrier or carriers proposing such rate (hereafter in this paragraph referred to as the 'proponent carrier'). In determining variable costs, the Commission shall, at the request of the carrier proposing the rate, determine only those costs of the carrier proposing the rate and only those costs of the specific service in question, except where such specific data and cost information is not available. The Commission shall not include in variable cost any expenses which do not vary directly with the level of service provided under the rate in question. Notwithstanding any other provision of this part, no rate shall be found to be unjust or unreasonable, or not shown to be just and reasonable, on the ground that such rate exceeds a just or reasonable maximum for the service rendered or to be rendered, unless the Commission has first found that the proponent carrier has market dominance over such service. A finding that a carrier has market dominance over a service shall not create a presumption that the rate or rates for such service exceed a just and reasonable maximum. Nothing in this paragraph shall prohibit a rate increase from a level which reduces the going concern value of the proponent carrier to a level which contributes to such going concern value and is otherwise just and reasonable. For the purposes of the preceding sentence, a rate increase which does not raise a rate above the incremental costs (as determined through formulas prescribed by the Commission) of rendering the service to which such rate applies shall be presumed to be just and reasonable.
 
 
 87
 "(c) As used in this part, the terms
 
 
 88
 "(i) 'market dominance' refers to an absence of effective competition from other carriers or modes of transportation, for the traffic or movement to which a rate applies; and
 
 
 89
 "(ii) 'rate' means any rate or charge for the transportation of persons or property.
 
 
 90
 "(d) Within 240 days after the date of enactment of this subdivision, the Commission shall establish, by rule, standards and procedures for determining, in accordance with section 15(9) of this part, whether and when a carrier possesses market dominance over a service rendered or to be rendered at a particular rate or rates. Such rules shall be designed to provide for a practical determination without administrative delay. The Commission shall solicit and consider the recommendations of the Attorney General and of the Federal Trade Commission in the course of establishing such rules."
 
 
 91
 (c) Section 15 of the Interstate Commerce Act (49 U.S.C. 15) is amended by redesignating paragraphs (8) through (14) thereof as paragraphs (10) through (16) thereof, respectively, and by inserting therein a new paragraph (9) as follows:
 
 
 92
 "(9) Following promulgation of standards under section 1(5)(d) of this part, whenever a rate of a common carrier by railroad subject to this part is challenged as being unreasonably high, the Commission shall, upon complaint or upon its own initiative and within 90 days after the commencement of a proceeding to investigate the lawfulness of such rate, determine whether the carrier proposing such rate has market dominance, within the meaning of section 1(5)(c)(i) of this part, over the service to which such rate applies. If the Commission finds that such a carrier does not have such market dominance, such finding shall be determinative in all additional or other proceedings under this Act concerning such rate or service, unless (a) such finding is modified or set aside by the Commission, or (b) such finding is set aside by a court of competent jurisdiction. Nothing in this paragraph shall limit the Commission's power to suspend a rate pursuant to this section, except that if the Commission has found that a carrier does not have such market dominance over the service to which a rate applies, the Commission may not suspend any increase in such rate on the ground that such rate as increased exceeds a just or reasonable maximum for such service, unless the Commission specifically modifies or sets aside its prior determination concerning market dominance over the service to which such rate applies."
 
 
 
 *
 For convenience the court will refer to this case hereafter as Atchison, Topeka & Santa Fe Ry. Co. v. ICC (Market Dominance)
 
 
 [1]
 Section 202(b) of the Reform Act, 49 U.S.C. § 1(5)(c)
 
 
 [2]
 Section 202(b), 49 U.S.C. § 1(5)(d)
 
 
 [3]
 Section 1(5) of the Interstate Commerce Act, 49 U.S.C. § 1(5)
 
 
 [4]
 S.Rep.No.94-499, 94th Cong., 1st Sess. 2, 3, 7 (1975); H.R.Rep.No.94-725, 94th Cong., 1st Sess. 80, 81 (1975); U.S.Code Cong. & Admin.News 1976, p. 14
 
 
 [5]
 Section 101(a) of the Act, 45 U.S.C. § 801(a), states that
 (i)t is the purpose of the Congress in this Act to provide the means to rehabilitate and maintain the physical facilities, improve the operations and structure, and restore the financial stability of the railway system of the United States, and to promote the revitalization of such railway system, so that this mode of transportation will remain viable in the private sector of the economy and will be able to provide energy-efficient, ecologically compatible transportation services with greater efficiency, effectiveness, and economy, through (1) ratemaking and regulatory reform . . . .
 
 
 [6]
 Section 101(b) of the Act, 45 U.S.C. § 801(b), declares it to be the policy of Congress to
 (1) balance the needs of carriers, shippers, and the public;
 (2) foster competition among all carriers by railroad and other modes of transportation, to promote more adequate and efficient transportation services, and to increase the attractiveness of investing in railroads and rail-service-related enterprises;
 (3) permit railroads greater freedom to raise or lower rates for rail services in competitive markets;
 (4) promote the establishment of railroad rate structures which are more sensitive to changes in the level of seasonal, regional, and shipper demand;
 (5) promote separate pricing of distinct rail and rail-related services;
 (6) formulate standards and guidelines for determining adequate revenue levels for railroad; and
 (7) modernize and clarify the functions of railroad rate bureaus.
 
 
 [7]
 See Section 202(b) of the Act, 49 U.S.C. § 1(5)(b)
 
 
 [8]
 The following are the seven fact patterns initially proposed by the Commission:
 (1) Where the rate in issue has been discussed or considered in proceedings before a rail carrier rate bureau acting under an agreement filed with and approved by the Commission pursuant to section 5b, or the former section 5a, of the Interstate Commerce Act;
 (2) Where no other carrier of any mode has handled a significant amount of the involved traffic for at least one year preceding the filing of the proposed rates;
 (3) Where other carriers of any mode have handled a significant amount of traffic but there is no evidence of actual price competition in the past three years;
 (4) Where the rate in issue exceeds the rate(s) charged by carriers (offering the same or interchangeable service between points involved) by 25 percent or more;
 (5) Where the rate at issue exceeds the fully allocated cost of providing the service by 50 percent or more;
 (6) Where the distance between origin and destination exceeds 1,500 miles, except that when the involved movement occurs as a single-line movement, market dominance may be presumed where the distance exceeds 1,200 miles, providing, however, in either instance that when a rate is subject to a minimum weight, such minimum weight shall equal or exceed 20 net tons;
 (7) Where the commodity moving under the rate in issue customarily moves in bulk shipments.
 Notice of Proposed Rulemaking and Order of Mar. 10, 1976, at 5-6, J.A. 6-7.
 
 
 [9]
 The following are the fact patterns proposed in the interim report, and the presumptions to which they would give rise:
 (1) In any proceeding involving a determination as to market dominance wherein the evidence adduced establishes that the rate in issue has been discussed, considered, or approved under a rate bureau agreement filed with the Commission, pursuant to section 5a or 5b of the Interstate Commerce Act, a rebuttable presumption will arise that a carrier participating in the rate or, in such discussion, or consideration, does not provide effective competition to the proponent rail carrier for the involved traffic or movement.
 Interim Report at 22, J.A. 746.
 (2) A rebuttable presumption of market dominance will arise where the proponent carrier has handled 70 percent or more of the involved traffic or movement during the preceding year; the market share of the proponent will be deemed to include the share of any affiliates, and of any carriers with whom the proponent carrier has discussed, considered or approved the rate in issue.
 Id. at 31, J.A. 755.
 (3) A rebuttable presumption of market dominance will arise where the rate in issue exceeds the variable cost of providing the service by 80 percent or more.
 Id. at 63, J.A. 787.
 (4) A rebuttable presumption of market dominance will arise where affected shippers or consignees have made a substantial investment in rail-related equipment which prevents or makes impractical the use of another carrier or mode.
 Id. at 72, J.A. 796.
 
 
 [10]
 The rate/variable cost relationship presumption, see note 9, item 3, Supra, was modified so that a rate equal to 160% Of variable cost would trigger the presumption. In addition, certain technical and procedural modifications were made
 
 
 [11]
 A petition for reconsideration of the reduction in the rate/variable cost relationship presumption was filed by the Council on Wage and Price Stability on October 29, 1976. J.A. 1208. By order of February 22, 1977, the Commission denied reconsideration, J.A. 1268, setting forth in an appendix to the order the basis for its selection of the 160% Of variable cost figure, J.A. 1271. The validity of the rate/variable cost relationship presumption is discussed Infra at ---- - ---- of --- U.S.App.D.C., at 634 - 636 of 580 F.2d
 
 
 [12]
 See, e. g., McCormick, Evidence § 344 at 817-18 (2d ed. 1972):
 To impose a "rational connection" limitation upon the creation or operation of presumptions in civil cases would mean that only presumptions based on probability would be permissible. Such a limitation would ignore other, equally valid, reasons for the creation of the rules. Thus, although there is undoubtedly some outer limit on the creation of a presumption in a civil case, great latitude is and should be given. Considerations which have now been explicitly rejected in criminal cases, such as the comparative knowledge of the parties with regard to the facts and the power of the legislature to do away with a claim or a defense entirely, should remain significant in determining the validity of a civil presumption.
 (Citations omitted.)
 
 
 [13]
 The Committee intends "to retain oversight of the administration of these provisions to insure that the underlying purpose of this provision is not frustrated by a too narrow or protectionist attitude on the part of the Commission." H.R.Rep.No.94-725, 94th Cong., 1st Sess. 70 (1975)
 
 
 [14]
 In a related argument, the FTC appears to assert that the long history of regulation in the railroad industry has distorted normal market indicators of competition (or absence thereof), thus heightening the unreliability of presumptions based on ordinarily significant factors. FTC Brief at 11. This argument is premature. The Commission's regulations will prove themselves in their application, and may have utility and vitality notwithstanding any "distortions" from normal market indicators that have been built in during the regulatory past
 
 
 [15]
 The railroads argued before the Commission that a presumption of market dominance should not arise unless the proponent carrier controls more than 80% Of the market. Comments of Railroads on the Commission's Interim Report at 19, J.A. 1115. In their brief, however, they have abandoned their objection to the 70% Figure. The Federal Trade Commission argues against the use of presumptions as a regulatory tool, see supra at 14, but, assuming the use of presumptions, it does not dispute the propriety of the 70% Figure. FTC brief at 19 n.*
 
 
 [16]
 FTC Brief at 19 n.*, 25 n.*** (expressing a qualified acceptance of the 70% Test for market dominance, while rejecting a counterpresumption of effective competition)
 
 
 [17]
 In accord with this reading is the stress placed by the Conference Report on "recogniz(ing) the absence of forces which normally govern competitive markets." H.R.Rep.No.94-781, 94th Cong., 2d Sess. (1976); S.Rep.No.94-595, 94th Cong., 2d Sess. (1976) (Conference Report) at 148
 
 
 [18]
 Brief for the Petitioners in No. 76-2048 at 27-34
 
 
 [19]
 At oral argument, counsel for the ICC appeared to state that, in the event that none of the three presumptions of market dominance are triggered, the Commission will determine itself to be without jurisdiction. However, the regulations, J.A. 1206, seem to permit a showing of market dominance even when no presumption is triggered. In practice it may be difficult for the ICC to demonstrate market dominance when none of the fact situations giving rise to the presumptions are present sufficiently difficult to discourage the Commission from attempting the feat. If such is the case, the proponent carrier would, in practice, enjoy what amounts to a presumption of effective competition when None of the presumptions of market dominance are triggered. This would not, of course, be as favorable to the railroads as the sort of counterpresumption they seek, since the latter would apparently operate to "cancel out" a presumption of market dominance triggered by rate/variable cost or captive shipper investment considerations
 We make these observations only for the purpose of delineating the likely situation of the railroads under the challenged presumptions. We do not thereby intend to hold that the Commission may not attempt to show market dominance even in the absence of a presumption thereof. In light of the unclarity alluded to above, we permit the Commission to adhere to the apparent intendment of its brief if it so wishes.
 
 
 [20]
 I. e., transportation by the shipper of its own freight
 
 
 [21]
 Potential competition exists where the threat of entry into the market by potential competitors exercises a restraining effect on the level of rates charged by existing carriers
 
 
 [22]
 Geographic competition is present when a shipper-consignor may direct his product to a different destination, or a shipper-consignee may secure the same product from a different origin
 
 
 [23]
 Product competition exists when a shipper may substitute another product for the product subject to the rate in issue
 
 
 [24]
 The railroads argue that any cost presumption is unacceptable since it frustrates the legislative purpose of eliminating maximum rate regulation where effective competition exists. A cost presumption, so the argument goes, in effect defines market dominance so as to "capture" just those rates that would be held too high under the "just and reasonable" standard (which has traditionally used cost as a criterion for judging fairness of rates) thus making deregulation illusory. The argument has some appeal but on balance must bow to the fact that the presumption is rebuttable
 
 
 [25]
 The Commission explained the change in focus from fully allocated to variable costs by noting that rates will tend to be close to variable costs in competitive situations, and will tend to increase relative to variable costs in noncompetitive situations. Id. at 69, J.A. 793
 Since fully allocated costs approximate 129 percent of variable costs for railroads, on the average, See Interim Report at 68, J.A. 792, the Commission's initial figure of 50 percent in excess of fully allocated costs in equivalent, on the average, to 94% In excess of variable costs (1.50 X 1.29 = 1.94).
 
 
 [26]
 Commissioner Corber, in a separate opinion, rejected the figure of 180 percent of variable costs as too generous. He favored a figure of 150 percent, based on the assumption that a rate equal to 140 percent of variable costs would permit a "reasonable profit margin," and that a 10 percent margin of error should be allowed in light of the Commission's inexact costing techniques. Interim Report at 106, J.A. 830
 
 
 [27]
 This perhaps puts the matter too strongly. The ICC might say that it is prepared to presume market dominance from a rate 60% Above variable cost in a case where it has not secured the data necessary to calculate market share, or quantitative market share is a matter of doubt or dispute. If the cost presumption were so limited, there would be less concern over the precise predicate in terms of profit range, especially since what results from the presumption is only jurisdiction and not a substantive order
 
 
 [28]
 The railroads argue that the need to determine, in every case, the impracticality of using alternative modes will inhibit satisfaction of the statutory requirement that the determination of market dominance be made "without administrative delay." Brief of Petitioners in No. 76-2048 at 65. The ease of implementation of the investment presumption must be determined in the course of its application. If the railroads' predictions of impracticality prove accurate, the Commission will, of course, be in a position to institute appropriate modifications. In similar fashion, we believe it is premature at this time to pass on the alleged lack of clarity of key terms in the challenged presumption, such as "affected shipper" and "substantial investment." Id. at 66. We have stressed, and continue to emphasize, the preliminary nature of the challenged regulations, and the possibility of later refinement in the light of experience
 
 
 [29]
 The new provision is more specific as to the terms that an agreement must contain in order for carriers acting under it to qualify for antitrust immunity
 
 
 [30]
 United States v. Philadelphia National Bank, 374 U.S. 321, 350-51, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963)
 
 
 [31]
 The electric companies urge that unless a presumption of market dominance is required with respect to a rate discussed under a rate bureau agreement, railroads will be able to exercise effective control over market price free from regulation. This could be achieved, it is argued, if some railroads purposely refrain from participating in a rate bureau discussion of a rate increase, or in the rate, and then file the same increase themselves. Brief of Petitioners in No. 76-2070 at 14. Mere conscious parallelism in pricing does not, however, constitute an antitrust violation as a matter of law, though it may be circumstantial evidence of an illegal agreement. Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954). Whether railroads abstaining from a rate bureau discussion do in fact provide effective competition for the proponent carrier is a matter left open, under the Commission's regulations, to a determination based on all relevant facts in a particular case. Parallelism in pricing is relevant to such a determination, but not dispositive
 
 
 [32]
 The FTC believes that the rate bureau presumption should be eliminated, on the ground, Inter alia, that its function is adequately served by the market share presumption (which attributes the market share of all carriers with which the rates have been discussed to the proponent railroad). The Commission rejected this view, Interim Report at 28-29, J.A. 752-53; Final Order at 8-9, J.A. 1195-96, because of what it perceived as the difficulty of obtaining tonnage information for all carriers participating in rate bureau discussions a task that would be necessary if the market share presumption were to afford adequate protection to shippers against rate bureau activity. We accept the Commission's judgment in this respect as reasonable
 
 
 [33]
 Had a rail public counsel existed at the start of this dispute, he would have voiced another perspective
 
 
 [34]
 Portland Cement Ass'n v. Ruckelshaus, 158 U.S.App.D.C. 308, 486 F.2d 375 (1973); Portland Cement Ass'n v. Train, 168 U.S.App.D.C. 248, 513 F.2d 506 (1975); Elizabethtown Gas Co. v. FERC, --- U.S.App.D.C. ----, 575 F.2d 885 (1978)