**ALABAMA POWER COMPANY et al., Petitioners,***

v.

**Douglas M. COSTLE, as Administrator, Environmental Protection Agency, et al., Respondents,***

**Sierra Club et al., Intervenors.***

**No. 78–1006.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 20, 1979.

Decided June 18, 1979.

As Amended Dec. 14, 1979.

---

* Consolidated with the following cases (identified by this Circuit's case number and petitioner), in all of which the Environmental Protection Agency is the respondent: No. 78–1008, American Petroleum Institute, et al.; No. 78–1525, Part II, Environmental Defense Fund, Inc.; No. 78–1590, Part II, Hampton Roads Energy Company; No. 78–1591, Alabama Power Company, et al.; No. 78–1592, Alabama Power Company, et al.; No. 78–1595, American Petroleum Institute, et al.; No. 78–1596, American Petroleum Institute, et al.; No. 78–1610, Part II, The Montana Power Company, et al.; No. 78–1752, District of Columbia, a municipal corporation; No. 78–1801, National Coal Association; No. 78–1802, National Coal Association; No. 78–1805, Mining and Reclamation Council of America, Inc.; No. 78–1806, Mining and Reclamation Council of America, Inc.; No. 78–1807, The Montana Power Company, Pacific Power and Light Company, Portland General Electric Company, Puget Sound Power and Light Company, and Washington Water Power Company; No. 78–1810, Part II, The Pittston Company; No. 78–1811, American Iron and Steel Institute; No. 78–1815, Part II, American Paper Institute and the National Forest Products Association; No. 78–1816, Ashland-Warren, Inc.; No. 78–1817, Ashland-Warren, Inc.; No. 78–1818, Manufacturing Chemists Association, Chemical Products Corporation, Dow Chemical Company, FMC Corporation, Monsanto Company, PPG Industries, Inc., Rohm and Haas Company, Stauffer Chemical Corporation, Union Carbide Corporation, and Allied Chemical Corporation; No. 78–1819, Part II, Manufacturing Chemists Association, Chemical Products Corporation, Dow Chemical Company, FMC Corporation, Monsanto Company, PPG Industries, Inc., Rohm and Haas Company, Stauffer Chemical Company, Union Carbide Corporation, and Allied Chemical Corporation; No. 78–1821, Asarco Incorporated; No. 78–1822, American Mining Congress, United States Steel Corporation, Buttes Resources Company, Cyprus Mines Corporation, Energy Fuels Corporation, Freeport Exploration Company, ITT Resources, Inc., Johnsmanville Sales Corporation, The Montana Coal Council, Thermal Energy Inc., and Wyoming Mineral Corporation; No. 78–1823, Westmoreland Coal Company and Westmoreland Resources, Inc.; No. 78–1824, Westmoreland Coal Company and Westmoreland Resources, Inc.; No. 78–1825, State of Texas; No. 78–1827, Mitchell Energy Co., a corporation; No. 78–1828, Cheyenne Refining Co., a corporation; No. 78–1829, Gary Western Co.; No. 78–1830, LA Jet, Inc., a corporation; No. 78–1832, Sierra Club; No. 78–1833, Reynolds Metals Company, Inc.; No. 78–1834, Colorado Interstate Gas Company, Tennessee Gas Pipeline Company, a division of Tenneco, Inc., and Natural Gas Pipeline Company of America; No. 78–1836, GATX Terminals Corporation, General American Transpor-

tation Corporation and GATX Corporation; No. 78–1837, Occidental Oil Shale, Inc. and Ashland Colorado, Inc.; No. 78–1838, Part II, Koppers Company, Inc.; and No. 78–1839, Part II, USM Corporation.

Henry V. Nickel, Washington, D. C., with whom George C. Freeman, Jr., Richmond, Va., Michael B. Barr, Washington, D. C., Andrea S. Bear, Richmond, Va., were on the brief, for Alabama Power Company, et al., in Nos. 78–1006, 78–1591, 78–1592, 78–1801, 78–1802 and 78–1832.

Michael K. Glenn, Washington, D. C., for American Paper Institute, et al., in Nos. 78–1815 and 78–1832.

James R. Bieke with whom Francis M. Shea, Richard T. Conway, William R. Galeota and Joseph C. Zengerle, Washington, D. C., were on the brief, for Montana Power Company, et al., in Nos. 78–1610, 78–1807 and 78–1832.

Richard G. Wise, Asst. Corp. Counsel, Washington, D. C., with whom Louis P. Robbins, Acting Corp. Counsel, John C. Salyer, Washington, D. C., Asst. Corp. Counsel, were on the brief, for District of Columbia in No. 78–1752.

Jim Mathews, Asst. Atty. Gen., State of Texas, with whom John L. Hill,** Atty. Gen., David M. Kendall Jr.,** First Asst. Atty. Gen., State of Texas, Austin, Tex., were on the brief, for State of Texas in No. 78–1825.

John J. Adams and David F. Peters, Richmond, Va., were on the brief, for American Petroleum Institute, et al., in Nos. 78–1008, 78–1595, 78–1596, 78–1801 and 78–1832.

J. Michael Hines, John D. Field, III and John R. Feore, Jr., Washington, D. C., were on the brief, for Hampton Roads Energy Company in Nos. 78–1590 and 78–1832.

Alan B. Mollohan and J. Roy Spradley, Jr., Washington, D. C., were on the brief, for Mining and Reclamation Council of America, Inc. in Nos. 78–1805 and 78–1832.

Jonathan B. Hill and Donald W. Markham, Washington, D. C., were on the brief, for The Pittston Company in Nos. 78–1810 and 78–1832.

Roger M. Golden, Pittsburgh, Pa., was on the brief, for American Iron and Steel Institute in Nos. 78–1811 and 78–1832.

George J. Miller, Philadelphia, Pa., and William A. White, Washington, D. C., were on the brief, for Westmoreland Coal Company, et al., in Nos. 78–1823, 78–1824 and 78–1832.

James L. Lyons, Washington, D. C., was on the brief, for Mitchell Energy Co., et al., in Nos. 78–1827, 78–1828, 78–1829, 78–1830 and 78–1832.

Carl W. Ulrich, William R. Duff and Henry E. Brown, Washington, D. C., were on the brief for Colorado Interstate Gas Company, et al., in Nos. 78–1832 and 78–1834.

William S. Hemsley, Jr., Washington, D. C., was on the brief, for GATX Terminals Corporation, et al., in Nos. 78–1832 and 78–1836.

Albert J. Beveridge, III and Charles A. Patrizia, Washington, D. C., were on the brief, for Reynolds Metals Company, Inc. in No. 78–1833.

Thomas C. Matthews, Jr., Charles C. Abeles and Donald T. Bucklin, Washington, D. C., were on the brief, for Occidental Oil Shale, Inc., et al., in Nos. 78–1832 and 78–1837.

Frank H. Morison, Donald Quander and James L. White, Denver, Colo., were on the

** At the time the brief was filed.

brief, for ASARCO Inc. in Nos. 78–1821 & 78–1832.

Robert J. Rauch, Washington, D. C., for Environmental Defense Fund in Nos. 78–1006, 78–1008, 78–1525, Part II and 78–1610, Part II.

Peter J. Herzberg, Trenton, N. J., with whom H. Anthony Ruckel, Denver, Colo., James H. Cohen and Kristine L. Hall, Washington, D. C., were on the brief, for Sierra Club Legal Defense Fund, Inc. in Nos. 78–1006, 78–1008, 78–1591, 78–1592, 78–1595, 78–1596, 78–1752, 78–1839, Part II, 78–1801, 78–1802, 78–1805, 78–1806, 78–1807, 78–1810, Part II, 78–1811, 78–1815, Part II, 78–1816, 78–1817, 78–1818, 78–1819, Part II, 78–1821, 78–1822, 78–1823, 78–1824, 78–1825, 78–1827, 78–1828, 78–1829, 78–1830, 78–1832, 78–1833, 78–1834, 78–1836, 78–1837 and 78–1838, Part II.

Erica L. Dolgin, Angus Macbeth and Elizabeth Stein, Attys., Dept. of Justice, Washington, D. C., with whom Sanford Sagalkin, Acting Asst. Atty. Gen., Washington, D. C., was on the brief, for respondent Douglas M. Costle, et al.

Peter H. Wyckoff, Atty., Environmental Protection Agency, Syracuse, N. Y., a member of the bar of the Supreme Court of New York pro hac vice by special leave of Court, Jeffrey C. Smith and Lydia N. Wegman, Attys., Environmental Protection Agency, Washington, D. C., with whom Joan Z. Bernstein, Gen. Counsel, Environmental Protection Agency, Washington, D. C., was on the brief, for respondent Environmental Protection Agency, et al.

Theodore L. Garrett, Washington, D. C., with whom Patricia A. Barald, Washington, D. C., was on the brief, for petitioners Manufacturing Chemists Ass'n, et al., in Nos. 78–1818 and 78–1819, and Ashland-Warren, Inc., in Nos. 78–1816 and 78–1817.

Lawrence V. Robertson, Jr., Las Vegas, Nev., and John H. Cheatham, III, Wash-

ington, D. C., were on the brief, for intervenor, Interstate Natural Gas Association of America in No. 78–1834.

Kenneth C. Moore and Geoffrey K. Barnes, Cleveland, Ohio, were on the brief for Koppers Co. in No. 78-1838.

Robert T. Connery, Denver, Colo., with whom William E. Murane and Paul D. Phillips, Denver, Colo., were on the brief, for American Min. Congress, et al., in Nos. 78–1822 and 78–1832.

William E. Murane, Denver, Colo., with whom Robert T. Connery and Paul D. Phillips, Denver, Colo., were on the brief, for Colorado Interstate Gas Co., et al., in Nos. 78–1832 and 78–1834.

Also James W. Moorman and Earl Salo, Attys., Dept. of Justice, Washington, D. C., entered appearances for respondent, Douglas M. Costle, et al. in Nos. 78–1006 and 78–1008.

Also Tom Watson, Washington, D. C., entered an appearance for intervenor Sierra Pacific Power Company in No. 78–1832.

Also Bruce J. Terris and Philip G. Sunderland, Washington, D. C., entered appearances for intervenor, Environmental Defense Fund, et al. in No. 78–1610, Part II.

Before LEVENTHAL, ROBINSON and WILKEY, Circuit Judges.

PER CURIAM:

This case concerns the validity of final regulations [1] promulgated by the Environmental Protection Agency (EPA) on June 19, 1978 embracing the prevention of significant deterioration of air quality in the nation's "clean air areas." [2] These "PSD" regulations interpreted and began the implementation of various provisions of the

---

[1]. 40 C.F.R. §§ 51.24, 52.21 (1978).

[2]. "Clean air areas" are those air quality control regions designated under sections 107(d)(1)(D) & (E) of the Clean Air Act as having ambient air quality better than the applicable national primary or secondary ambient air quality standard, or for which there is insufficient data to make a determination of the air quality. 42 U.S.C. §§ 7407(d)(1)(D), (E) (1978).

Clean Air Act Amendments of 1977.[3] Pertinent provisions are gathered in title I, part C of the Clean Air Act as amended (hereafter sometimes referred to as the "PSD part" or the "PSD provisions").

Before us are consolidated petitions for review filed in this court, as provided by statute, within 60 days of the date of promulgation.[4] Significant preliminary issues raised by these petitions were argued on October 10, 1978, and our ruling on those questions issued March 27, 1979.[5] The remaining issues raised by the petitions, involving primarily interpretative questions of comprehensive importance,[6] came to be argued on April 19 and 20, 1979.

The judicial review provisions as well as other features of the Clean Air Act Amendments set a tone for expedition of the administrative process that effectuates the congressional purpose to protect and enhance an invaluable national resource, our clean air. We are motivated by such concerns to issue today this *per curiam* opinion, after careful and complete consideration of the case. This opinion summarizes our final rulings on the questions presented. In view of the large number of questions raised, the

members of the panel have divided responsibility for preparation of the court's more comprehensive opinions, which will issue in due course.[7] The purpose of today's expedited judgment and *per curiam* opinion is to enable EPA to proceed as soon as possible to commence rulemaking or other proceedings necessary to promulgate those revisions in the PSD regulations required by our rulings, and to take other prudent action to effectuate congressional policies.

## A. Potential To Emit

The definition of "major emitting facility" is of central importance to the statutory scheme and is the source of a pivotal question in this case. Only major emitting facilities are subject to the preconstruction review and permit requirements of section 165 of the Act. Such facilities are defined in section 169(1) as those stationary sources of air pollutants from among 28 listed categories which "emit, or have the potential to emit" 100 tons per year or more of any air pollutant plus any other stationary source with the "potential to emit" 250 tons per year or more of any air pollutant.[8]

---

**3.** P.L. 95–95, 91 Stat. 685, 42 U.S.C. §§ 7401 *et seq.* (1978) (hereafter cited as the "1977 Amendments"). The Clean Air Act is hereafter cited as "C.A.A." or as the "Act."

**4.** C.A.A. § 307(b)(1), 42 U.S.C. § 7607(b)(1) (1978).

**5.** *Citizens To Save Spencer County v. EPA,* 195 U.S.App.D.C. 30, 600 F.2d 844 (upholding EPA's exercise of legislative rulemaking authority to set the effective date for the PSD preconstruction review and permit requirements of the 1977 Amendments as March 1, 1978, subject to minor exceptions).

**6.** In addition to the effect on the interpretation and implementation of the PSD provisions, several of the questions decided today are of significance for other comprehensive rulemakings under the 1977 Amendments, *e. g.,* the regulations for "nonattainment areas" under part D of the Act, 42 U.S.C. §§ 7501–07 (1978).

**7.** We anticipate at this time that the detailed opinions will issue before the end of this summer.

**8.** C.A.A. § 169(1) provides:

The term "major emitting facility" means any of the following stationary sources of air

pollutants which emit, or have the potential to emit, one hundred tons per year or more of any air pollutant from the following types of stationary sources: fossil-fuel fired steam electric plants of more than two hundred and fifty million British thermal units per hour heat input, coal cleaning plants (thermal dryers), kraft pulp mills, Portland Cement plants, primary zinc smelters, iron and steel mill plants, primary aluminum ore reduction plants, primary copper smelters, municipal incinerators capable of charging more than two hundred and fifty tons of refuse per day, hydrofluoric, sulfuric, and nitric acid plants, petroleum refineries, lime plants, phosphate rock processing plants, coke oven batteries, sulfur recovery plants, carbon black plants (furnace process), primary lead smelters, fuel conversion plants, sintering plants, secondary metal production facilities, chemical process plants, fossil-fuel boilers of more than two hundred and fifty million British thermal units per hour heat input, petroleum storage and transfer facilities with a capacity exceeding three hundred thousand barrels, taconite ore processing facilities, glass fiber processing plants, charcoal production facilities. Such term also includes any other

■ EPA has interpreted the phrase "potential to emit" as referring to the measure of a source's "uncontrolled emissions"—*i. e.*, the projected emissions of a source when operating at full capacity, with the projection increased by hypothesizing the absence of the air pollution control equipment designed into the source.[9] We think the fairly discernible meaning of the statute, applying its text and giving consideration both to the comprehensive statutory scheme and to the legislative history, is that an emitting facility is "major" within the meaning of section 169(1), only if it either (1) actually emits the specified annual tonnage of any air pollutant, or (2) has the potential, when operating at full design capacity, to emit the statutory amount. The purpose of Congress was to require a permit before major amounts of emissions were released. In our view, the design capacity of the facility takes into account not only its maximum productive capacity (which EPA uses) but also the design controls on emissions. The "potential to emit" of any stationary source must be calculated on the assumption that air pollution control equipment incorporated into the design of the facility will function to control emissions in the manner reasonably anticipated when the calculation is made. EPA's regulations are remanded in this respect for appropriate revision.

### B. *General Exemption for Stationary Sources Emitting Less Than 50 Tons Per Year of Any Air Pollutant*

Having swept in too many facilities, in our view, by its interpretation of "potential to emit," EPA inserted in its PSD regulations a partial exemption from the preconstruction review and permit requirements of section 165 for all major emitting facilities that emit less than 50 tons per year of any air pollutant when operating at maxi-

mum capacity and employing those air pollution controls imposed either by the applicable State Implementation Plan (SIP) or by an enforceable permit.[10] This exemption reflected EPA's judgment that application to such sources of the full preconstruction review and permit process would not be cost effective.

■ This aspect of the regulations is remanded to the agency. In a sense, the 50-ton-per-year exemption has been rendered academic by our ruling that an emitting facility does not qualify as "major" (and thus become subject to the requirement of obtaining advance permits) unless that facility emits or has the potential to emit, at a minimum, 100 tons per year or more of any air pollutant, after full account has been taken of the operation of the facility's air pollution control equipment. However, standard doctrine teaches us that our proper course is to remand this matter for further consideration by EPA.

■ In view of the possibility that EPA may refashion, rather than terminate, its exemption, we guide our remand by noting that EPA does not have broad authority in this statute to create exemptions on the basis of an analysis of cost-effectiveness. It has an obligation to regulate the subject matter delegated to it by Congress. The agency does possess authority, inherent in the statutory scheme, to overlook circumstances that in context fairly may be considered *de minimis*. EPA also has an implied authority to provide for exemptions when compelled by administrative necessity. The difference is one of degree but the assumption of authority reflected in the 50-ton-per-year exemption goes beyond the exercise of these more narrow administrative powers.

**9.** 40 C.F.R. §§ 51.24(b)(3), 52.21(b)(3) (1978).

**10.** 40 C.F.R. §§ 51.24(j)(2), (k)(1)(ii), 52.21(j)(2), (k)(1)(ii) (1978).

source with the potential to emit two hundred and fifty tons per year or more of any air pollutant. This term shall not include new or modified facilities which are nonprofit health or education institutions which have been exempted by the State.
42 U.S.C. § 7479(1) (1978).

## C. Source Definition

EPA has defined the term "source" to include "any structure, building, facility, equipment, installation or operation (or combination thereof) which is located on one or more contiguous or adjacent properties and which is owned or operated by the same person (or by persons under common control)." [11]

### 1. Constituents of "Source"

■ We hold that the definition of "stationary source" provided in section 111(a)(3) of the Act controls the meaning of that term when used in the PSD part of the statute. We come to our conclusion after evaluating the interplay of various provisions of the Act in light of applicable principles of statutory construction.[12] Section 111(a)(3) restricts the term "stationary source" to the nouns "building, structure, facility, or installation." We find that EPA exceeded its statutory authority by including within its definition of "stationary source" the terms "equipment" and "operation," though we rule that EPA has considerable latitude in defining the four remaining terms—"structure," "building," "facility" and "installation"—to include a wide range of pollution-emitting sources within the reach of the PSD provisions. To the extent EPA intended its definition of the term "stationary source" to constitute an interpretation of the four statutory terms for purposes of the PSD part, it may recast its definition in appropriate fashion.

### 2. Combination of "Sources" To Comprise a Single "Stationary Source"

■ The definition of "stationary source" was interpreted within the context of the

section 111 new source performance standards (NSPS) in *ASARCO Inc. v. EPA*, 188 U.S.App.D.C. 77, 578 F.2d 319 (1978). In *ASARCO* we held that a "stationary source" could be comprised of only a single building, structure, facility, or installation. EPA's PSD regulations are challenged as combining numerous facilities as a single source, in contravention of *ASARCO*. EPA argues that *ASARCO*'s interpretation of the 1970 version of the Act was overruled because the 1977 Amendments, adopted prior to *ASARCO*, implicitly ratified EPA's pre-*ASARCO* interpretation. In our view, *ASARCO* defined the *initial* intent of Congress; in the 1977 Amendments, Congress made no change. Hence *ASARCO* controls our ruling.

■ However, EPA has flexibility to refashion its regulations so as to achieve what it presented as its objectives. In *ASARCO*, we recognized that EPA retained broad discretion to define the scope of each term—building, structure, facility, and installation. While a "stationary source," as used in the PSD provisions of the Act, may consist of only a single *e. g.*, "facility," EPA has latitude to define the term "facility," to encompass an entire plant or other "common sense industrial grouping" appropriate to the PSD review and permit process.[13] The pertinent regulations are remanded for further consideration.[14]

### 3. Common Ownership and Control

Petitioners challenge the reach of EPA's definition of stationary source to embrace a grouping of industrial activities "located on

---

11. 40 C.F.R. §§ 51.24(b)(4), 52.21(b)(4) (1978).

12. *E. g.*, §§ 169(2)(C) & 111(a)(3), (4), 42 U.S.C. §§ 7479(2)(C) & 7411(a)(3), (4) (1978); §§ 165(a)(3) & 110(j), 42 U.S.C. §§ 7475(a)(3) & 7410(j) (1978); §§ 165(a)(8) & 111, 42 U.S.C. §§ 7475(a)(8) & 7411 (1978); §§ 112(a)(3) & 111(a) (introductory phrase), 42 U.S.C. 7412(a)(3) & 7411(a) (1978).

13. The individual terms "facility," "building," "structure" and "installation" are not defined by the Act. EPA has latitude to adopt definitions of the terms for the purposes of the PSD

provisions that are different in scope from the definitions of the terms employed for the purposes of, *e. g.*, the NSPS provisions. But the definitions applicable to each set of provisions must be reasonably appropriate for the purposes of those sections.

14. EPA's regulations currently define "facility" as "an identifiable piece of process equipment." 40 C.F.R. §§ 51.24(b)(5), 52.21(b)(5). EPA has discretion to broaden this definition in an appropriate fashion.

one or more contiguous or adjacent properties and . . . owned or operated by the same person (or by persons under common control)."[15] The agency has evidenced an intention to refrain from unreasonable literal applications of the definition and instead to consider as a single stationary source only common sense industrial groupings. This approach is generally acceptable. The reasonableness *vel non* of EPA action in this regard must await review of specific applications.

### 4. Section 169(1) Special Minimum Size Limitations

■ The first sentence of the statutory definition of major emitting facility contains special minimum size limitations for four categories of stationary sources.[16] A source in any of these categories, is not a "major" facility unless it not only emits (or has the potential to emit) 100 tons per year or more of any air pollutant (but less than 250 tons per year) but also satisfies the applicable minimum size limitation. The question presented is whether these size limitations are applicable to sources in one of the four categories that have the potential to emit 250 tons per year or more. The key statutory language is in the second sentence of the definition, which encompasses "any other source" with the potential to emit 250 tons per year or more of any air pollutant. When applying the 250-ton-per-year threshold, EPA has disregarded the special size limitations of the definition's first sentence.[17] The legislative history of section 169(1) supports our ruling that

---

15. Text accompanying note 11 *supra*.

16. The four categories are: fossil-fuel fired steam electric plants of more than two hundred and fifty million British thermal units per hour heat input; municipal incinerators capable of charging more than two hundred and fifty tons of refuse per day; fossil-fuel boilers of more than two hundred and fifty million British thermal units per hour heat input; and petroleum storage and transfer facilities with a capacity exceeding three hundred thousand barrels. Note 8 *supra*.

17. 40 C.F.R. §§ 51.24(b)(1)(ii), 52.21(b)(1)(ii) (1978).

EPA's interpretation is correct in this respect.

### D. Fugitive Emissions

#### 1. Sources of Fugitive Emissions

■ EPA's regulations encompass sources of "fugitive emissions" (including "fugitive dust") as well as "industrial point sources."[18] Industry petitioners argue that the PSD provisions apply to industrial point sources only, and leave regulation of fugitive emissions to the discretion of the States.

One focus of concern that illustrates this problem is the mining industry. Emissions from mining facilities are principally fugitive emissions—as contrasted with emissions from point sources such as stacks or chimneys. By far the preponderant fugitive emission is fugitive dust in the form of windblown particulates.

Industry argues that a mining operation cannot properly be defined as either a "building, structure, facility or installation," and thus cannot constitute a "stationary source" that may become subject (if it meets the conditions set by section 169(1) for a "major" emitting facility) to the PSD preconstruction review and permit process. Our examination of the relevant materials yields a contrary conclusion. In our view, EPA's discretion to define the term "facility" by the concept of "common sense industrial groupings" would encompass application of the term to a source of fugitive emissions such as a major mining operation.

---

18. *See* 43 Fed.Reg. 26395 (1978) ("G. Fugitive Dust"). The Act does not provide definitions of these terms. As commonly understood, emissions from an "industrial point source" include emissions from a stack or from a chimney. We discern that when Congress used the term "fugitive emissions" in section 302(j) of the Act it was referring to emissions from a stationary source that emanate from other than a stack or chimney. The term "fugitive dust" refers to fugitive emissions of particulate matter.

Industry points to section 110(a)(5)(C), which provides:

> the term "indirect source" means a facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution.

The terms "real property," "road" and "highway" are included in defining "indirect source." But they are omitted from the list of nouns that are used in defining "stationary source' in section 111(a)(3). Industry argues this discloses a congressional intention that the term stationary source does not encompass any real property or road—the principal sources of fugitive dust within a mining facility.

We discern from these provisions, as well as other evidence, that Congress did not intend that, taken in isolation, real property or roads could constitute stationary sources. But there is no warrant for construing the statute to require exemption from regulation for emissions that come from real property or roads which are themselves constituent parts of a "facility," or an "installation," as those terms appropriately may be defined by EPA. There may be a source of fugitive emissions subject to regulation—within the context of preconstruction review and permit requirements for major emitting facilities—in situations such as a yard within the confines of an industrial plant wherein materials are stored or moved by truck between loading docks, storage places, and mill intakes; or such as a road coiling down the slope of an open-pit mine. We only rule on a general question, leaving for the future the determination of specific situations, which will be considered in the light of pertinent EPA regulations.

### 2. Control of Fugitive Emissions

■ Once a major emitting facility becomes subject to the preconstruction review and permit process, it must satisfy the air pollution control requirements of section 165 for each pollutant regulated under the Act that the facility emits or will emit. In this respect, it is immaterial whether the regulated pollutant is an industrial emission from a point source or a fugitive emission. In EPA's view, the definitional section 169(1), as well as section 165, applies of its own force to both emissions from industrial point sources and fugitive emissions. EPA's regulations treat the two types of emissions alike for purpose of determining whether a stationary source qualifies under section 169(1) as a "major" emitting facility. In our view, the statute covers fugitive emissions in the calculation of that section's annual tonnage thresholds only if and when EPA issues an appropriate legislative rule. Section 302(j) of the Act provides:

> Except as otherwise expressly provided, the terms "major stationary source" and "major emitting facility" mean any stationary facility or source of air pollutants which directly emits, or has the potential to emit, one hundred tons per year or more of any air pollutant (including any major emitting facility or source *of fugitive emissions of any such pollutant, as determined by rule by the Administrator* ).

(Emphasis supplied.) This definition specifies 100 tons per year as the threshold for major emitting facilities and major stationary sources, and allows within the calculation of emission tonnages fugitive emissions of any air pollutant, "*as determined by rule by the Administrator.*" The section prescribes a requirement of legislative rulemaking before fugitive emissions, including fugitive dust, may be encompassed in the determination of whether an emitting facility qualifies as "major."

The definition in section 302(j) is subject to modification where "otherwise expressly provided." For example, section 169(1) is such an express provision for the purposes of the PSD part of the statute—increasing the tonnage threshold (to 250 tons) for sources other than the 28 categories listed in the first sentence of section 169(1). But in section 169(1) there is no express modification of the legislative rulemaking requirement for inclusion of fugitive emissions.

We cannot properly bypass the statutory requirement of rulemaking, which may define a legislative response to policy considerations in view of the special problems presented in the regulation of sources where the predominant emissions are fugitive, particularly fugitive dust. The requisite rulemaking gives flexibility to provide industry-by-industry consideration and the appropriate tailoring of coverage.

### E. Fugitive Dust Exemption

 EPA created by rulemaking a partial exemption from statutory permit requirements for major emitting facilities of fugitive dust.[19]

This exemption rule was based on a premise that we have held to be erroneous —namely, that the statute of its own momentum subjects major emitting facilities of fugitive dust to PSD preconstruction review and permit requirements. In view of our ruling in Section D, and in accordance with our discussion in Section B, we vacate the generalized exemption for fugitive dust, and remand for further consideration. EPA has latitude, on remand, to accomplish its objective through appropriate rulemaking.[20]

19. 40 C.F.R. §§ 51.24(k)(5), 52.21(k)(5) (1978). The regulation maintains the requirement that such sources apply best available control technology (BACT), (as defined by section 169(3), 42 U.S.C. § 7479(3) (1978)), but exempts them from the otherwise-required showing that particulate emissions from the facility will not exceed either the applicable national ambient air quality standards (NAAQS) or the allowable increments.

20. When the parties come to reappraise the subject in the light of our opinion, they may consider the use of section 111, and the authority it confers over sources, for the realization of pertinent objectives. 42 U.S.C. § 7411 (1978).

EPA has discretion to define the pollutant termed "particulate matter" to exclude particulates of a size or composition determined not to present substantial public health or welfare concerns. Such "excluded particulates" would remain "air pollutants" within the meaning of the Act, section 302(g), but would be dropped from the list of pollutants compiled by the EPA Administrator under section 108(a)(1)—a list comprised of air *pollutants* the "emissions of which, in his judgment, cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare." Since national ambient air quality standards may exist only for those pollutants listed under section 108(a)(1), "excluded particulates" would not be subject to NAAQS. See C.A.A. §§ 108(a)(1), (2), 109, 302(g), 42 U.S.C. §§ 7408(a)(1), (2), 7409, 7602(g) (1978).

However, under section 111(b)(1)(A) the Administrator must compile a list of categories of stationary *sources* that in his judgment "[cause, or contribute] significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare." This list could include sources of "particulate matter," as newly defined, even though the great preponderance of particulates emitted by such sources have become "excluded particulates." A source may "significantly" contribute to air pollution on account of its emissions of "particulate matter" even though the quantities of "particulate matter" emitted fall well below the tonnage threshold that would qualify such a source, due to the emissions of that pollutant, as a major emitting facility. Section 111(d)(1) grants authority to the Administrator to establish standards of performance for *any* air pollutant emitted by a source on the list compiled under section 111(b)(1)(A). (*See also* C.A.A. § 111(a)(1)(C).) Thus, due to the difference in focus of sections 108 and 111—one on *pollutants* and the other on *sources*—a standard of performance might be developed governing "excluded particulates" though no NAAQS has been promulgated. Once a standard of performance has been promulgated for "excluded particulates," those pollutants become "subject to regulation" within the meaning of section 165(a)(4), 42 U.S.C. § 7475(a)(4) (1978), the provision requiring BACT prior to PSD permit approval.

EPA has authority by rulemaking to incorporate fugitive emissions, including fugitive dust, in the calculation of tonnage thresholds required to qualify a stationary source as a major emitting facility. *See* C.A.A. § 302(j), 42 U.S.C. § 7602(j) (1978); Section D, *supra.* After such a rulemaking, a major emitting facility of "excluded particulates" would become subject to the preconstruction review and permit requirements of section 165. The net result of the administrative action outlined above would be a requirement that such major emitting facilities apply BACT (section 165(a)(4)), but no need for a showing required by section 165(a)(3) that emissions of "excluded particulates" would not violate NAAQS or allowable increments. No NAAQS would exist for "excluded particulates" and the increments applicable to "particulate matter" would not apply. *See also* C.A.A. § 166, 42 U.S.C. § 7476 (1978) (premising development of increments for "other pollutants" on the existence of NAAQS for such pollutants).

## F. *Major Modification/Bubble*

### 1. *"Major" Modification*

The PSD provisions of the Act incorporate the definition of "modification" provided in section 111(a)(4): [21]

The term "modification" means any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted.

EPA's regulations define a "modification" for the purposes of the PSD part as a "major modification," incorporating the same tonnage thresholds EPA employed in its interpretation of the term major emitting facility—*i. e.,* 100 or 250 tons per year "uncontrolled emissions." [22]

We find no basis in the statutory language or in the legislative history for EPA's transformation of the term "modification" specified by Congress. A modification within the meaning of the PSD part is any physical change in or change in the method of operation of a stationary source that increases in *any* amount the quantity (when calculated for operation at full design capacity) of any air pollutant emitted by the source or that results in the emission of any air pollutant not previously emitted.

The pertinent regulation is remanded for reconsideration. EPA has authority to exempt from scrutiny *de minimis* emission increases caused by "modification" of a stationary source. Administrative necessity is a source of latitude to defer scrutiny until a number of small "modifications" have caused the total net emission increase to surpass a reasonable threshold. However, this aspect of the definitional interpretation before us does not reflect the exercise of such administrative powers.

### 2. *Restriction of Offset*

Industry petitioners claim discretion to make changes in a single major emitting facility, without prior permit or authorization, provided a change in design or operation that increases emissions is offset by other contemporaneous changes that decrease emissions so that there is no net increase in the potential to emit any air pollutant. EPA's regulations restrict in certain respects the ability of the emitter to make such offsetting changes without permission.[23] Its restrictions are beyond EPA's statutory authority.

Industry's freedom to offset properly may be circumscribed by EPA if it chooses to exercise its broad discretion to define the components of the term "stationary source" so as to provide a narrow scope. EPA's latitude in this respect is in turn confined by the condition that EPA's definition of "stationary source" for purposes of administration of the PSD provisions would govern not only the definition of "modification" but also the coverage of section 169(1). However, given a concept of "stationary source," the "modification" of the source has two components: (1) there must be a physical change in or a change in the method of operation of a stationary source; and (2) there must be a net increase in the potential to emit any air pollutant. A series of contemporaneous changes in the source does not qualify as a "Modification" within the meaning of the PSD part if it does not result in a net increase in the source's potential to emit any air pollutant. We do not begrudge what we discern as the intent of Congress because it gives freedom in the scheduling of source changes. There may be a policy basis for this in a legislative forecast that the prospect of avoiding or of deferring the regulatory cost of the PSD preconstruction review and permit process provides an incentive to upgrade the quality of air pollution control technology employed in each facility by accompanying each de-

---

**21.** C.A.A. § 169(2)(C), 42 U.S.C. § 7479(2)(C) (1978).

**22.** 40 C.F.R. §§ 51.24(b)(2), 52.21(b)(2) (1978); *see* Section A *supra.*

**23.** 40 C.F.R. §§ 51.24(i), (j), (k); 52.21(i), (j), (k) (1978).

sign change or expansion with an offsetting improvement in air pollution control.[24] As for the possibility of abuse in a company's deliberate deferral of BACT, EPA may cope with this by adopting a narrower definition of "facility" for purpose of new source performance standards under section 111 than it has adopted for purposes of the PSD part.[25]

## G. Protection of the Increments

■ The question presented is whether EPA has authority after a determination that a state implementation plan "is substantially inadequate to prevent significant deterioration or that an applicable increment is being violated," to require the SIP to "be revised to correct the inadequacy or the violation."[26] We hold that EPA has authority under the statute to correct or to prevent a violation of the increments, but not to dictate to the States their policy for management of the consumption of allowable increments.

Our ruling is supported by the language of sections 161, 163, and 165(a)(3), as well as by the legislative history. EPA must deny a preconstruction permit to an applicant if it is determined on the basis of meaningful projections from reliable data that allowable increments will be violated when the

applicant commences operations and that the applicant will cause or contribute to such a violation.[27] Further, once it is determined that the increments are actually being exceeded, EPA has authority to require a rollback of operations or the application of retrofit air pollution control technology so long as such requirements are reasonable. The determination of reasonableness for specific applications must await review of individual cases.[28]

## H. Sources Located in Non-Attainment Areas

■ Section 165(a) provides that a PSD permit is required before a major emitting facility "may be constructed in any area to which this part applies." Industry petitioners contend that this text makes the permit requirement applicable only to sources located within "clean air areas." That term refers to those air quality control regions in which the ambient air quality does not exceed the applicable NAAQS, or for which there is insufficient data to make such a determination.[29] In contrast are the "non-attainment areas," defined in section 171(2) as those air quality control regions designated, under sections 107(d)(1)(A)–(C), as regions that fail to meet the standards of an applicable NAAQS. EPA's regulations extend the permit requirements of section

---

**24.** A major emitting facility will become subject to the permit requirement of section 165 only if "construction is commenced" on the facility after March 1, 1978. See C.A.A. § 165(a), 42 U.S.C. § 7475(a) (1978) (introduction); Citizens, note 5 supra. For a facility in existence prior to the effective date of section 165, "construction is commenced" whenever a "modification" is made. See C.A.A. § 169(2)(C), 42 U.S.C. § 7479(2)(C) (1978).

The economic incentive to upgrade gradually the air pollution control technology employed in an existing facility as a part of the ongoing process of expansion and alteration of operations to adopt to demands of the marketplace would ease the economic impact on existing sources of a transition to BACT. Should this aspect of the statutory scheme cause effects deemed harmful to the environment, recourse must be had to further congressional consideration.

**25.** Note 13 supra. This is obviously not inconsistent with our ruling that the definition of "source" for the PSD provisions must apply to

both the coverage and the modification provisions of the PSD part.

**26.** 40 C.F.R. § 51.24(a)(3) (1978).

**27.** Section 165(a)(3) provides that the burden of proof on this question is placed on the permit applicant; but under the circumstances of a particular case, the burden of coming forward with evidence of meaningful projections of increment violation may fall to the agency.

**28.** The factors relevant to the determination of reasonableness include the cause of the violation of the increment ceiling and whether the rollback or retrofit requirement has been applied by a rule of general applicability or by some reasonable attribution of responsibility.

**29.** See C.A.A. §§ 161, 163(b), 42 U.S.C. §§ 7471, 7473(b) (1978). The clean air areas are identified pursuant to C.A.A. §§ 107(d)(1)(D), (E), 42 U.S.C. §§ 7407(d)(1)(D), (E) (1978); see note 2 supra.

165 to all sources, wherever located, if the emissions from the source have an impact on any clean air area.[30] In our view, the preconstruction review and permit requirements of section 165 apply both to major emitting facilities located in clean air areas and to those major emitting facilities located in nonattainment areas that have a substantial impact on a clean air area *in another State*. However, the requirements of section 165 are not triggered by sources located in nonattainment areas simply because they have an adverse impact on a clean air area *within the same State*. We reach this conclusion after a careful analysis of the statutory scheme and the specific language of the provisions.

We do not accept the premise of industry petitioners that "any area to which this part applies" is a phrase synonymous with the term "clean air areas." The statutory scheme contemplates in section 107 that States will be divided into "air quality control regions" (not "areas"). Section 162 takes up the air quality control regions that have been designated pursuant to section 107(d)(1)(D) or (E) and breaks them down into "class I areas" and "class II areas." It is apparent that an "area" may constitute only a portion of an air quality control region, and further evident from the operation of section 162(a) that an "area" may be plucked from the midst of an air quality control region and given an individual identity on the basis of the use to which that area has been put. Section 164 controls the redesignation of areas previously classified as "class I", "II" or "III," but neither section 162 nor section 164 gives full content to the phrase "any area to which this part applies." Certainly, all class I, II, and III areas (*i. e.*, the clean air areas) are areas "to

which this part applies." But the phrase has a more comprehensive aspect.

The government sought to extend the phrase "to which this part applies" by reliance on the general scheme of the statute, rather than by reference to any section defining an application. It is our view that interpretation of a statute as carefully and precisely crafted as this one requires that we locate a specific statutory provision as a predicate for agency jurisdiction, a provision that identifies in what way "the [PSD] part applies" to areas other than clean air areas.

At argument, government counsel disclaimed reliance on section 161, which provides that state implementation plans "shall contain emission limitations and such other measures, as may be necessary . . . to prevent significant deterioration of air quality in each [clean air area]." Our own analysis of the provision reveals at least as a reasonable construction, that section 161 does not provide a basis for application of section 165 to sources within nonattainment areas.[31]

We do find in section 160(4) a statutory basis for extension of the section 165 phrase "any area to which this part applies" to an "area" that may be a part of a "nonattainment area." Section 160(4) provides as one purpose of the PSD part: "to assure that emissions from any source in any State will not interfere with any portion of the applicable implementation plan to prevent significant deterioration of air quality for any other State." The congressional intention to avoid "interference" with maintenance of allowable increment ceilings or maximum concentrations in any clean air area encompasses a sensitivity to any substantial adverse interstate impact on air quality.[32]

---

**30.** 40 C.F.R. §§ 51.24(i)(1), 52.21(i)(1) (1978).

**31.** This does not exclude the provisions of section 165 from SIPs, for they are expressly incorporated in the SIPs, by section 110(a)(2)(D).

**32.** EPA's authority under the Act includes latitude to determine when, by virtue of type and extent, pollution exceeds the insubstantial and threatens or constitutes an "interference" with another State's PSD control measures.

EPA's current regulations create a presumption that every major emitting facility, wherever located, is subject to the section 165 preconstruction review and permit process. The use of presumptions subject to rebuttal is a device within EPA's administrative kit. But a finding of substantial actual or potential adverse impact on air quality in a clean air area of another State is a prerequisite for extension of the section 165 permit authority to sources in nonattainment areas.

It embraces impact from sources in both nonattainment areas and clean air areas in another State.

Section 110(a)(2)(E)(i) provides a vehicle for implementing the congressional objective of abating substantial interstate air pollution. That provision requires that an SIP shall contain "adequate provisions . . . prohibiting any stationary source within the State from emitting any air pollutant in amounts which will . . . interfere with measures required to be included in the applicable implementation plan for any other State under [the PSD part]."

Section 126 provides a mechanism for detecting interstate air pollution and for enforcing the congressional objective. It requires enforcement of the provision in section 110(a)(2)(E)(i) prohibiting "interference" with another State's pollution control efforts. The structure of the comprehensive notice provision in section 126(a) indicates that a major emitting facility located in a nonattainment area is "subject to part C"—i. e., subject to the section 165 preconstruction review and permit process—if emissions from that facility would have a substantial adverse impact on air quality in a clean air area of another State.[33]

Based on the import of these provisions we perceive that, in addition to all clean air areas, an "area" within a "nonattainment area" is subject to the PSD part if that area is put to use as a location for a stationary source that has or will have a substantial adverse impact on air quality in a clean air area of another State. Here, as in section 162(a), an "area" is defined by the use to which it is put.

We do not discern from the statute or from the legislative history a similar intention to subject to section 165 permit requirements major emitting facilities located within nonattainment areas that have an adverse impact on air quality in a clean air area of the same State but no such impact on a clean air area of another State. Under the statute absolute limitations are placed on air pollution in both clean air areas and nonattainment areas, but the States are given latitude to manage the pattern of their internal growth within the confines of these limitations. In effect, the Act gives to the States authority to determine as a matter of internal resolution that the sound course is to adopt a policy of growth favoring concentration of industry in nonattainment areas (with pollution perhaps spilling over into clean air areas), rather than favoring dispersal of new economic development throughout the clean air areas of the State.

However, a federalist policy of deferring to a State concerning its internal growth management is inadequate to control the problems of interstate pollution abatement. For this the statute provides special mechanisms. The statute includes: the statement of purpose in section 160(4); the requirement of section 110 that a State's plan (SIP) prohibit its sources from emitting air pollution that will substantially "interfere" with another State's PSD control measures; the enforcement mechanism of section 126 to detect and to abate such interstate interferences. These provide a statutory foundation for application of the preconstruction review and permit requirements of section 165 to certain sources in nonattainment

---

33. We discern in section 126(a) an intention that adequate notice be provided of all significant interstate air pollution. Section 126(a)(1)(B) requires notice by "each major proposed new (or modified) source," located in *either a clean air area or a nonattainment area,* which "may significantly contribute" to levels of air pollution in excess of NAAQS. This provision provides notice of adverse interstate impact on the air quality of *nonattainment areas.* To complete the intended comprehensive notice mechanism, section 126(a)(1)(A), if reasonably construed, should account for sources of significant adverse interstate impact on *clean air areas.* This is precisely what it does if one applies the premise that a source with substantial adverse interstate impact on air quality in a clean air area is "subject to part C." But if one applies the limitation argued for by industry petitioners on the sources subject to the PSD provisions, then there results a gaping hole in the statutory notice mechanism: there would be no notice requirement for a source located in a nonattainment area of one State that has a substantial adverse impact on air quality in a clean air area of another State—arguably the type of interstate polluters most in need of abatement.

areas with substantial interstate air pollution impacts.

## I. Regulation of Pollutants Other Than Sulfur Dioxide and Particulate Matter

EPA's regulations [34] have extended the PSD preconstruction review and permit process to encompass pollutants other than sulfur dioxide and particulate matter, the two air pollutants for which allowable increments have been specified by the Act.[35] We have considered the challenge of industry petitioners. We conclude that the agency has followed the clear mandate of the statute.

Various provisions of section 165 direct that the review and permit process shall extend beyond regulation pertaining to sulfur dioxide and particulate matter. For example, section 165(a)(3) requires a demonstration of compliance with any "applicable emission standard or standard of performance under this Act," a showing that includes a demonstration pertaining to pollutants other than sulfur dioxide and particulates; section 165(a)(4) expresses a requirement for application of BACT for "each pollutant subject to regulation under this Act," a phrase that refers to a considerable list of pollutants; section 165(e)(1) specifies a requirement of monitoring, also for "each pollutant subject to regulation under this Act;" and section 165(e)(3)(B) requires an analysis with respect to generalized environmental impact for "each pollutant regulated under this Act."

Industry argues that section 166 places a limitation on the pollutants that may be regulated under section 165. This reliance is misplaced. Section 166 has a different focus, the development of maximum allowable increments or equivalent limitations for those pollutants (other than sulfur dioxide and particulate matter) for which NAAQSs have been or will be established.

## J. Best Available Control Technology (BACT)

### 1. Inclusion of Visible Emission Standard

Section 169(3) defines the term "best available control technology." [36] EPA's regulations provide that BACT "means an emission limitation (including a visible emissions standard) . . . ." [37] The addition of the phrase within the parentheses is the only way in which the text of the pertinent regulation varies from the statutory language. It is challenged by industry petitioners as a usurpation of authority.

In our view, industry petitioners misconstrue the import of inclusion of the parenthetical phrase within the regulation's definition. BACT is defined, in general, as a level of control technology appropriate to the facts and circumstances of the particular permit applicant. EPA is correct in its view that, where appropriate, BACT may include a visible emissions standard. *Portland Cement Ass'n v. Train*, 168 U.S.App. D.C. 248, 513 F.2d 506 (1975), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1976). Application of BACT requirements is subject to appropriate court review on a case-by-case basis. We do not construe the regulations as requiring inclusion of a visi-

---

**34.** 40 C.F.R §§ 51.24(i)(1), 52.21(i)(1) (1978).

**35.** C.A.A. § 162, 42 U.S.C. § 7472 (1978).

**36.** C.A.A. § 169(3) provides:

The term "best available control technology" means an emission limitation based on the maximum degree of reduction of each pollutant subject to regulation under this Act emitted from or which results from any major emitting facility, which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such facility through applica-

tion of production, processes and available methods, systems, and techniques, including fuel cleaning or treatment or innovative fuel combustion techniques for control of each such pollutant. In no event shall application of "best available control technology" result in emissions of any pollutants which will exceed the emissions allowed by any applicable standard established pursuant to section 111 or 112 of this Act.

42 U.S.C. § 7479(3) (1978).

**37.** 40 C.F.R. §§ 51.24(b)(10), 52.21(b)(10) (1978).

ble emissions standard in every case. Nor do we see merit in industry petitioners' argument that section 169A, pertaining to visibility protection for class I areas, is the sole and exclusive embodiment of congressional concern for the appearance of the air in which we must live.

### 2. Scope of BACT

■ Section 165(a)(4) provides a requirement that the permit applicant has employed "the best available control technology for each pollutant subject to regulation under this Act emitted from, or which results from, such facility." EPA's regulations require BACT only for those pollutants for which the applicant would qualify as a major emitting facility—i. e., pollutants emitted in amounts surpassing the 100 or 250 ton-per-year thresholds of section 169(1).[38] We agree with the petition of the District of Columbia that there is an unambiguous statutory command—BACT "for each pollutant subject to regulation under this Act emitted from, or which results from, such facility." This phrase encompasses each pollutant for which EPA has promulgated e. g., an NAAQS, a new source performance standard, or a hazardous pollutant standard. Those regulations do not require or depend on emissions as large as 100 tons per year. We find no basis for circumscribing the BACT requirement as EPA has done.

EPA has authority to apply de minimis thresholds to such regulatory requirements. But such exemptions must be formulated with reasoned consideration for their context, with attention to the nature of the pollutant involved. At argument EPA put it that an emission of less than 100 tons per year may be exempted as de minimis. This extraordinary contention may have been engendered by the (erroneous) determination that facilities are evaluated under the Act with respect to their "uncontrolled emissions," in disregard of designed air pollution controls limiting actual emissions to

modest amounts. We have extirpated that erroneous premise (see section A). Freed of that constraint, it deems obvious that the mere fact that an actual emission is not in itself large enough (100 tons) to trigger permit requirements does not mean it is de minimis. While the regulation as issued is invalid, EPA has latitude on remand to reconsider its de minimis approach, in light of our ruling and opinion, including our discussion in Section A.

### K. Modeling

■ Industry petitioners claim EPA's modeling regulations[39] failed to give adequate responses to comments raising three crucial policy issues: (1) the inhibitory effect of the guidelines on the adoption of newly proposed potentially more accurate air pollution dispersion models; (2) the conservative nature of the assumptions employed in formulating the modeling guidelines; and (3) the failure of the guidelines to adopt the type of modeling analysis employed in a 1975 EPA/FEA report to Congress.

We have evaluated the materials before us and conclude that EPA fulfilled its responsibility under the Administrative Procedure Act, 5 U.S.C. § 553 (1976), to provide a reasoned response to all significant comments.

Our ruling today upholding the modeling regulations is a limited one. As EPA asserts, the development and evaluation of modeling techniques lie on the frontiers of scientific knowledge. This calls on EPA to proceed in the area with the care and flexibility appropriate to such intricate and novel subject matter.

### L. Monitoring

■ Environmental petitioners challenge EPA's monitoring regulations[40] as falling short of the statutory mandate in several respects. EPA argues that the Act, specifically the text of sections 165(a)(2) and (a)(7), grants broad discretion to the

---

**38.** 40 C.F.R. §§ 51.24(i)(1), 52.21(i)(1) (1978).

**39.** 40 C.F.R. §§ 51.24(m), 52.21(m) (1978).

**40.** Id. at § 165(a)(3), 42 U.S.C. § 7475(a)(3) (1978).

agency to formulate monitoring regulations.

The arguably discretionary language of sections 165(a)(2) and (a)(7) is in our view restricted by the plain language of section 165(e), which provides in part:

> The review provided for in subsection (a) shall be preceded by an analysis in accordance with regulations of the Administrator *promulgated under this subsection.*

(Emphasis supplied.) Subsection (e) unambiguously provides that certain requirements must be included in the monitoring regulations. Of course there are circumstances when statutory language mandatory in form is held to constitute a mere directory command to the agency, so that variance triggers no judicial sanction. In this case, however, the nature of the statutory command and its background in the legislative history supports our determination that the specification of monitoring requirements in section 165(e) must control agency action in this respect.

### 1. Pollutants for Which Monitoring Is Required

Section 165(e)(1) provides that the monitoring requirement "shall" include:

> an analysis . . . of the ambient air quality at the proposed site and in areas which may be affected by emissions from such facility *for each pollutant subject to regulation under this Act which will be emitted from such facility.*

(Emphasis supplied.) The regulations require monitoring only for pollutants for which there exists an NAAQS. This falls short of the statutory requirement since the source may emit pollutants that are "subject to regulation" by virtue of e. g., new source performance standards or regulation of hazardous pollutants. However, EPA has administrative discretion to dispense with monitoring for *de minimis* situations.

### 2. Required Uses of Monitoring Data

Subsection 165(e)(2) provides in part:

> Effective one year after date of enactment of this part, the analysis required by this subsection shall include continuous air quality monitoring data gathered for purposes of determining whether emissions from such facility will exceed the maximum allowable increases or the maximum allowable concentration permitted under this part.

This is a requirement for use of monitoring data to determine actual or potential violation of the allowable increments. EPA's regulations have required monitoring only to determine whether an applicable NAAQS will be exceeded. Again, the regulation falls short of statutory command.

EPA argues in justification for its restrictions both on the use of monitoring and on the number of pollutants covered that monitoring for actual air quality concentrations is technologically infeasible for all but a small number of pollutants and that current monitoring techniques are at best of questionable accuracy even for the relatively straight-forward measurement of whether an applicable NAAQS has been exceeded.

We discern from the statute a technology-forcing objective. Congress intended that monitoring would impose a certain discipline on the use of modeling techniques, which would be the principal device relied upon for the projection of the impact on air quality of emissions from a regulated source. Unless the employment of modeling techniques can be held to earth by a continual process of confirmation and reassessment, their use would inspire little confidence as a means for realistic projection of air quality. This objective is furthered by the development of sophisticated monitoring techniques, and the collection of the data base that would result from monitoring's widespread use. Of course even a congressional mandate, such as a technology-forcing requirement based on a congressional projection of emergence of technology for the future, is subject to a justified excuse from compliance where good-faith effort to comply has not been fruitful of results. That is far different from the exemption created by EPA on the basis of current technological infeasibility.

### 3. Requirement for Post-Construction Monitoring

 EPA has imposed no requirement for post-construction monitoring. This omission is not invalid. Section 165(a)(7) does make reference to a requirement of post-construction monitoring, but grants discretion to the agency in this regard—a discretion that has not been provided with respect to the pre-application monitoring requirements specified in subsection 165(e). Section 165(a)(7) provides as a condition of permit approval that the applicant:

> agrees to conduct such monitoring as may be necessary to determine the effect which emissions from any such facility may have, *or is having*, on air quality in any area which may be affected by emissions from such source.

(Emphasis supplied.) The determination of the post-construction monitoring that "may be necessary" is not dictated by any provision in subsection 165(e), which pertains to pre-application monitoring requirements. EPA has latitude to make a determination under subsection 165(a)(7) in light of the facts and circumstances of each case. There is also latitude to respond to suggestions that guidelines be formulated outlining the circumstances that require post-construction monitoring and the nature of that monitoring requirement.

Section 114 grants the Administrator broad authority to require monitoring by any source that in his judgment is necessary to carry out his responsibilities under the Act. This includes an authority to require post-construction monitoring, but does not compel such a requirement. Section 319 of the Act provides for development of a nationwide monitoring network, but this is to be the function of government, not the responsibility of permit applicants.

### 4. Guidelines for State Exemption Authority

 The monitoring requirement of subsection 165(e)(2) includes an instruction that:

Such data shall be gathered over a period of one calendar year preceding the date of application for a permit under this part unless the State, *in accordance with regulations promulgated by the Administrator*, determines that a complete and adequate analysis for such purposes may be accomplished in a shorter period.

(Emphasis supplied.) The pertinent regulations have failed to provide concrete guidance to the cognizant State authorities for the exercise of the partial exemption authority granted by the provision. Instead, they have left such determinations to the States on a completely open-ended basis. We discern a congressional intention that EPA furnish meaningful guidance to the States as to the circumstances appropriate for exemption. We remand for further consideration.

### M. Baseline Definition

### 1. Baseline Date

 EPA's regulations provide that the baseline measure of air quality—the pollution level that provides the basis for calculation of allowable increments—must be determined for each clean air area as of August 7, 1977, the date of enactment of the 1977 Amendments.[41] Section 169(4), which defines the term "baseline concentration" provides in part:

> The term "baseline concentration" means, with respect to a pollutant, the ambient concentration levels *which exist at the time of the first application for a permit in an area subject to this part*, based on air quality data available in the Environmental Protection Agency or a State air pollution control agency and on such monitoring data as the permit applicant is required to submit.

(Emphasis supplied.) The statute is explicit in its statement that the date for determining the baseline concentration is the date "of the first application for a permit in an area subject to this part." The provision contemplates that each area will have its individual baseline date, just as that area evidently must have an individualized de-

---

**41.** 40 C.F.R. §§ 51.24(b)(11), 52.21(b)(11) (1978).

termination of baseline concentration. Though the provision permits allowance for air pollution levels to increase until the date of the first permit application in each area, we cannot say that the plain meaning of the statute must be disregarded as leading to absurd results. Congress may reasonably have concluded that the accuracy of the determination of "baseline concentration" is of paramount importance, since it forms the basis for calculation of allowable increments which, with respect to the section 165 preconstruction review and permit process, may determine whether a particular source will be permitted to construct and to commence operations in an area, and which, in the case of a violation of an allowable increment ceiling, may trigger the promulgation of rollback or retrofit requirements. Congress may have concluded that retroactive adjustment of approximated baseline concentrations was an infeasible alternative, and that the acquisition and compilation of the data necessary to determine accurate baseline concentrations as of a uniform date was impractical. The wording used by Congress reflects a choice to rely chiefly on the data base provided by the one year pre-application monitoring requirement prescribed by subsection 165(e), as supplemented by data in the files of EPA and State agencies.

## 2. "Accounting" of Emissions

The balance of the section 169(4) definition of "baseline concentration" provides:

[The baseline concentration] shall take into account all projected emissions in, or which may affect, such area from any major emitting facility on which construction commenced prior to January 6, 1975, but which has not begun operation by the date of the baseline air quality concentration determination. Emissions of sulfur oxides and particulate matter from any major emitting facility on which construction commenced after January 6, 1975, shall not be included in the baseline and shall be counted against the maximum allowable increases in pollu-

tant concentrations established under this part.

The complete provision furnishes the rules for accounting of emissions—the determination whether particular emissions are to be included in the baseline concentration, or instead are to be counted against allowable increments. EPA correctly interpreted the provision as follows:

First, a "snapshot" is to be taken as of the baseline date of the actual ambient concentration levels for pollutants in each area. Emissions from existing sources are measured on the basis of actual monitoring data, which would reflect emissions at actual operating levels, rather than projections of emissions for sources operating at full design capacity.

Second, major emitting facilities on which construction commenced prior to January 6, 1975, but which have not begun operation as of the baseline date, are counted in the baseline concentration on the basis of their projected emissions for operation at full design capacity. Such sources are "existing" as of the baseline date in the sense that they will have "commenced construction" prior to that date, and such sources will not become subject to the requirements of section 165 unless there is effected a "modification" (a term that is explicated in Section F).

Congress was faced with a dilemma: how to take a "snapshot" of the actual emissions of a source not subject to a PSD permit requirement and not yet in operation. The statute reflects the compromise of including in the baseline concentration all emissions on a projected basis. It was not unreasonable to provide that if a source was designed to operate at a certain capacity, then, lacking a contrary measurement, it was appropriate to rate its emissions at that level.

Finally, the statute specifies that emissions of the two pollutants for which increments are specified by the Act—sulfur dioxide and particulate matter—emitted by

major emitting facilities that commenced construction after January 6, 1975, shall not be included in the baseline but should be counted against the allowable increments. The date January 6, 1975 was selected as a point of division because that was the effective date of PSD regulations, promulgated by EPA, which were replaced by the 1977 Amendments.

The overall theme of industry petitioners is that the provision under discussion is a patchwork that does not make up a coherent rational whole as written, and needs to be, in effect, reconstructed by judicial interpretation. We are satisfied that a rational foundation exists for the plain meaning of the provision.

All emissions not counted in the baseline concentration count against allowable increments. No distinction is drawn for these purposes between economic growth brought about by increased utilization of capacity in existing sources and that brought about by the construction of new industrial capacity. This approach follows from the text of the Act but it is not lacking in rational foundation, and does not undercut this application of the plain meaning of the statute.

### N. Stack Height

■ The industry petitioners challenge regulations implementing the special provisions of section 123 of the Act relating to the calculation of "stack height" and governing the use of actual stack height in determining the air pollution control requirements applicable to a source. One provision of section 123(a) is directed against the possibility that a source will use extremely tall stacks, higher than good engineering practice (GEP)[42] warrants, thus dispersing the emissions of pollutants and reducing detected levels of pollution nearby even though the total amount of emission of pollutants is not reduced but is only dispersed. The text of this provision reads:

> The degree of emission limitation required for control of any air pollutant under an applicable implementation plan under this title shall not be affected in any manner by—
>
> (1) so much of the stack height of any source as exceeds good engineering practice (as determined under regulations promulgated by the Administrator), or
>
> (2) any other dispersion technique.

The question presented is whether EPA correctly interpreted that section to require modeling of emissions based on stack height reflecting "good engineering practice." In our view, EPA's stack height regulations[43] have correctly construed section 123(a) of the Act. The legislative history demonstrates the purpose of ensuring that "emission limitations" not be avoided by the construction of tall stacks or chimneys that would disperse emissions to a greater extent than stacks or chimneys reflecting "good engineering practice" without reducing the total quantity of air pollutants emitted, which would cause a lower measurement of ambient air concentrations than would stacks reflecting GEP.

EPA has broadly interpreted section 123 as requiring that the use of greater-than-GEP stack heights be completely discounted

---

**42.** Section 123(c) provides in part:

For purposes of this section, good engineering practice means, with respect to stack heights, the height necessary to insure that emissions from the stack do not result in excessive concentrations of any air pollutant in the immediate vicinity of the source as a result of atmospheric downwash, eddies and wakes which may be created by the source itself, nearby structures or nearby terrain obstacles (as determined by the Administrator). For purposes of this section such height shall not exceed two and a half times the height of

such source unless the owner or operator of the source demonstrates, after notice and opportunity for public hearing, to the satisfaction of the Administrator, that a greater height is necessary as provided under the preceding sentence. In no event may the Administrator prohibit any increase in any stack height or restrict in any manner the stack height of any source.
42 U.S.C. § 7423(c) (1978).

**43.** 42 Fed.Reg. 57460 (1977) ("Tall Stacks").

for all purposes, subject to certain uncontested exceptions specified in the statute.

Industry petitioners assert that even where stack heights are greater-than-GEP, the source is entitled to credit for the reduced impact that tall stacks do provide in terms of lower concentrations in the nearby ambient air, provided the source applies BACT. The contention is based on the premise that this was the prior practice of EPA, and that Congress did not intend to repudiate it. The contention is refuted by the plain wording of the statute, which specifies that the "degree of emission limitation required . . . shall not be affected in any manner" by greater-than-GEP stack height. The definition of "emission limitation" in section 302(k) makes clear that the term encompasses an NAAQS or an increment ceiling, as well as required technological controls.[44] Thus, irrespective of the level of technological control applied by a source—BACT or otherwise—the impact of that source's greater-than-GEP stack height must be discounted for the appropriate determination of observance of an applicable NAAQS or of an increment ceiling.

Industry petitioners concede that EPA must discount for the greater-than-GEP stack height of a permit applicant, but argue that the air quality impacts of sources previously granted permits must be calculated on the basis of their actual stack heights. The contention, if accepted, would give an applicant the benefit of any predecessor's tall stacks. Again the contention is refuted by the explicit language of section 123: the required degree of emission limitation shall not be affected in any manner by the greater-than-GEP stack height "*of any source,*" a reference that includes sources other than the applicant.

### O. Fuel Switches

#### 1. Voluntary Fuel Switches

EPA's regulations[45] (1) exclude from the definition of "modification" voluntary fuel switches (*e. g.*, a change from natural gas to coal) by facilities constructed prior to January 6, 1975 that had the design capacity as of that time to make such a fuel switch; and (2) count the increased emissions from such voluntary fuel switches against allowable increments. These provisions are consistent with the statute. Industry petitioners' argument that these two actions are inconsistent treatments of similar concepts misses the mark because it fails to appreciate a distinction made by the statute, a distinction recognized by EPA.

The concept of a "modification" reflects consideration for a change in a facility that increases its potential to emit any air pollutant when operating at full design capacity. (*See* Section F.) A facility designed to burn, *e. g.*, either natural gas or coal, has the design capacity to do either. A shift from one fuel to the other does not increase the potential to emit any air pollutant and thus does not constitute a modification for the purposes of the PSD provisions.

On the other hand, as explained in Section M, the "accounting" procedure for determining whether emissions are to be included in baseline concentration, or are to be counted as pollution that consumes a part of the allowable increments, starts from the premise of a "snapshot" of actual emissions on the baseline date. It includes in the baseline concentration of a source in existence on the baseline date its actual emissions, and not the higher potential to emit that would have been realized if the source had operated at full design capacity. We consider the application of this principle

---

**44.** Section 302(k) provides:

The terms "emission limitation" and "emission standard" mean a requirement established by the State or the Administrator which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction.
42 U.S.C. § 7602(k) (1978).

**45.** 40 C.F.R. §§ 51.24(b)(2)(ii)(d), 52.21(b)(2)(ii)(d); *see* 51.24(b)(11), 52.21(b)(11) (1978).

to a source in existence on January 6, 1975, which subsequent to the baseline date uses its design so as to undertake a voluntary fuel switch that results in an increase in emissions. It is evidence that the increase in emissions (over and above the actual emissions on the baseline date, which are included in the baseline concentration) must be counted as consuming part of the allowable increments.

## 2. State-Ordered Fuel Switches

■ The statute makes special provision for federally-ordered fuel switches: (1) sections 163(c)(1)(A) and (B) authorize the Governor of a State, "for purposes of determining compliance with the maximum allowable increases in ambient concentrations of an air pollutant," to discount for the impact of increased emissions that result from federally-ordered fuel switches; and (2) section 111(a)(8) provides an exception from the definition of "modification" for federally-ordered conversions to coal. EPA's regulations incorporate the statutory exemptions.[46] The State of Texas argues that EPA abused its discretion when it failed to provide by rulemaking an exemption for State-ordered fuel switches similar in scope to the statutory exemption for federally-ordered fuel switches. Congress, not this court, is the appropriate forum for complaint. No provision of the statute as enacted gives any indication of a requirement that EPA grant the requested exemption. We discern that Congress may rationally have limited the statutory exemption on the basis that federal agencies that have authority to order the fuel switches encompassed by the statutory exemptions must consider as part of their decisionmaking process the environmental ramifications of their fuel switch orders, while there is no equivalent constraint on all State authorities.

## P. Phased Construction Projects

■ EPA's regulations[47] take into account the need for a comprehensive permit for construction projects that are to be completed in phases (a plan of construction characteristic of the utility industry). The comprehensive permit avoids the requirement of applying for separate permits for each phase. This not only minimizes regulatory burden, but assures the applicant that the economies achievable through a comprehensive project will not be undercut by a barrier to the later stages caused by interim consumption by others of all available increment.

EPA conditions such comprehensive permits so as to make them available only if the applicant agrees (1) to satisfy an independent BACT determination for each phase; (2) to commence construction[48] on each phase within 18 months of the target date specified in the original application (with a variance procedure available only for the commencement date of the first phase); and (3) to avoid any gaps in the course of construction exceeding 18 months. We find the concept of such a conditioned permit within EPA's statutory authority.

Our underlying premise, as set forth in Section C, is that EPA has a broad discretion in formulating the applicable definition of the term "facility" which will in turn delimit the scope of the terms "stationary

46. 40 C.F.R. §§ 51.24(b)(2)(ii)(c), (e); 52.-21(b)(2)(ii)(c), (e) (1978).

47. 40 C.F.R. §§ 52.21(s)(2), (3) (1978).

48. Section 169(2)(A) provides:
 The term "commenced" as applied to construction of a major emitting facility means that the owner or operator has obtained all necessary preconstruction approvals or permits required by Federal, State, or local air pollution emissions and air quality laws or regulations and either has (i) begun, or caused to begin, a continuous program of physical on-site construction of the facility or (ii) entered into binding agreements or contractual obligations, which cannot be canceled or modified without substantial loss to the owner or operator, to undertake a program of construction of the facility to be completed within a reasonable time.
 42 U.S.C. § 7479(2)(A) (1978).

source" and "major emitting facility." From this basis, it is permissible for EPA to condition the granting of a single comprehensive permit, encompassing a single multiphase facility, so long as the conditions of the permit are reasonable. We find completely reasonable the specified conditions of the comprehensive permit contemplated by the regulations. There is a balance of benefits to the utility industry (and the economy) against the abuse of undue preemption of increments by projects that would come to ultimate fruition only in a protracted time frame.

## CONCLUSION

The Environmental Protection Agency has proceeded with vigor and industry to carry out the Herculean task Congress has assigned to it by the Clean Air Act Amendments of 1977, formidable both in scope of work and limitations of time provided. In certain respects, congressional instructions have been conflicting.[49] Where Congress has not constrained agency discretion, we have approved its exercise—at least as manifested at this juncture. In certain respects we find that EPA's interpretations of various provisions are contrary to discernible legislative intent.

Our remand contemplates that EPA will approach its ongoing function with continued vigor and concern for both the public interest in curtailing pollution and the congressional constraints on agency discretion. Our opinion identifies our final rulings on the questions presented by the petitions for review. Although the detailed opinions of the court will issue in due course, we will entertain prior to their issuance narrowly focused petitions for reconsideration to the

panel. The court is prompted to adopt this novel procedure by its appreciation of the complex and subtle nature of this case. We shall give particular consideration to petitions for reconsideration, if any, because of the nature of the case, and because recusals preclude en banc reconsideration. However, we admonish the parties to take seriously our request that petitions for reconsideration be narrowly focused, crafted to advise the court of the ramifications of its rulings, and particularly to alert the court to any materials not presented previously that may bear significantly on the proper resolution of the questions presented. The court will not look with favor on arguments presented that merely reiterate those made previously, since there are specific matters not dealt with in this *per curiam* opinion that will be addressed in the more detailed opinions to follow. Furthermore, parties are encouraged to consolidate the presentation of any petitions for reconsideration in the manner adopted for briefing and oral argument. Such petitions may be submitted without prejudice to the right of filing in the ordinary course full petitions for reconsideration subsequent to the issuance of the court's detailed opinions.

*Affirmed in part; remanded in part.*

---

**49.** *See Citizens*, note 5 *supra*.